# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON,, | No. 46425-0-II |
| Respondent, | (Cons. With No. 46435-7-II) |
| v. | ORDER DENYING APPELLANT OEUNG'S MOTION FOR RECONSIDERATION, AND ORDER GRANTING APPELLANT ROSS'S MOTION FOR RECONSIDERATION, AND ORDER WITHDRAWING OPINION |
| SOY OEUNG AND AZIAS ROSS,, | |
| Appellants. | |

The unpublished opinion in this case was filed on June 14, 2016. Upon the motions of each appellant for reconsideration, it is hereby

ORDERED that appellant Oeung's motion for reconsideration is hereby denied. It is further

ORDERED that appellant Ross's motion for reconsideration is hereby granted, and the opinion previously filed on June 14, 2016 is withdrawn. A new opinion will be filed this same date.

IT IS SO ORDERED.

Dated this 27 day of September, 2016.

_____
SUTTON, J.

We concur:

_____
MAXA, A.C.J.

_____
MELNICK, J.

**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| STATE OF WASHINGTON, | No. 46425-0-II |
| | (Cons. with No. 46435-7-II) |
| Respondent, | |
| v. | |
| SOY OEUNG and AZIAS ROSS, | UNPUBLISHED OPINION |
| Appellants. | |

SUTTON, J. — Soy Oeung and Azias Ross appeal their multiple convictions[1] arising from a series of home invasion robberies in January and April 2012 (Ross) and May 2012 (Oeung). They argue that they are entitled to a new trial because of the violation of their public trial right during jury voir dire, the trial court's denial of their motion for mistrial, the prosecutor's misconduct during closing arguments, and the erroneous jury instructions on unanimity and reasonable doubt; further, they argue that there is insufficient evidence to support several of their convictions and the associated firearm enhancements. They also argue that the trial court made errors at their sentencing hearing. Finally, Ross argues separately that he received ineffective assistance of counsel and asserts two additional claims in a statement of additional grounds (SAG).

We hold that none of the alleged procedural errors during trial constitute reversible error and that there is sufficient evidence to support all of Oeung's and Ross's convictions and the

---

[1] Their convictions were for conspiracy, first degree robbery, first degree burglary, unlawful imprisonment, theft of a firearm, first degree trafficking in stolen property, and the associated firearm enhancements.

associated firearms enhancements. We also hold that Ross's counsel was effective and that his SAG claims have no merit.

Further, the sentencing court did not err when it ruled that Oeung's and Ross's first degree burglary and first degree robbery convictions were not the same criminal conduct, but did err when it dismissed certain convictions on counts that violated double jeopardy rather than vacating and dismissing them with prejudice. We further hold that the sentencing court did not err when it denied Oeung's request for an exceptional mitigated sentence and that the remainder of Oeung's judgment and sentence was proper. However, we hold that the sentencing court did err in sentencing Ross on counts I, XI and LXXII, and Oeung on count XIV. We reverse and remand with instructions to resentence Ross on counts I and XI and Oeung on count XIV not to exceed the statutory maximum sentence, acknowledge the scrivener's error on Ross's count LXXII, and order the sentencing court to resentence Ross on count LXXI.

FACTS

I. ROBBERIES: JANUARY 25, APRIL 27, AND MAY 10, 2012

A. JANUARY 25, 2012—ROSS ROBBERY #1

On the evening of January 25, 2012, Soeung Lem entered her home through the back door when a man grabbed her arm and held a "gun" against her head. VI Verbatim Report of Proceedings (VRP) at 799. Lem never saw what the man was holding because she was afraid to look at it. The intruder asked her, first in English, then in Cambodian, "Do you know what this is?" VI VRP at 800-01. The man then forced her to lay down on her stomach on the kitchen floor.

The gunman, who was wearing dark clothes and a mask, asked her where she kept her gold. He then led her to the living area, where he laid her on the couch, tied her hands behind her back, and covered her face with a jacket. There was another man also searching the house. After both men finished searching the house, the gunman removed the jacket from Lem's face and told her not to get up for 15 minutes. The incident lasted about 30 minutes.

Lem called her children, who called the police. Lem described the men as slender, wearing dark clothes, and that one man was taller than the other. The men stole $4,000 in cash and several pieces of gold jewelry, which Lem and her daughter later identified in photos the police provided.

In July, police showed a photo array to Lem, who selected and signed her name next to a photograph that depicted Nolan Chouap, who Lem identified at trial as the man who tied her up.[2]

B. APRIL 27, 2012— ROSS ROBBERY #2

On the evening of April 27, 2012, Bora Kuch was at home with her two-year-old grandson, watching television upstairs in the home that she shared with her daughter, and son-in-law, Fred Van Camp. She heard a loud noise downstairs and went to investigate. Two men confronted her on the stairs and pushed her back into a bedroom.

The men wore dark clothes and one covered his face with one of Kuch's shirts. The man who pushed Kuch was "over 20 years old, long hair, with mustache" and Kuch stated that he was "Khmer" because he threatened her in Cambodian. V VRP at 635. The other man searched the

---

[2] Other witnesses also testified that the person in the photograph was one of the robbers.

3

house, and Kuch did not see any details about him, but did note that he was taller than the man who pushed her.

Shortly after he pushed her into her room, the shorter man pointed a gun at Kuch. At one point, when Kuch attempted to open a window, the gunman shouted, "Do you want to die?" and pointed a black handgun at her. V VRP at 637, 642. The gunman then tied Kuch's hands behind her back "[w]ith some kind of wire." V VRP at 638. Kuch managed to untie herself while the men were still searching the house, but the men found her and tied her up again.

The two men continued to threaten Kuch, demanded keys to a safe, and asked for money. Kuch told the men that there was no money in the safe, only guns; Kuch gave the men $500 cash she kept hidden under her mattress when they threatened to hurt her grandson. The men broke into the safe, and one of the men showed Kuch a gun he took from the safe, stating, "This is a nice gun, grandma." V VRP at 652. While they were emptying the safe, Kuch heard the "taller guy" talking to a female on a phone. V VRP at 659.

The men took a number of handguns and jewelry from the safe and a necklace that Kuch's grandson was wearing. After they emptied the safe, the men left. The incident lasted for approximately two hours.

Van Camp learned of the robbery and called the police on his way home where he discovered eight firearms missing from the safe in his office. His friend, Sidoung Chan Sok, owned six of the stolen firearms. One of his guns, a 9 mm handgun, was mounted with a red laser-sight.

When police returned to show him photographs of recovered property, Van Camp identified four of the stolen firearms—a 12 gauge Remington 870 shotgun, a Mossberg 500 shotgun, a

4

Springfield XT 9 mm handgun, and a Taurus 9 mm handgun. All but the 12 gauge shotgun belonged to Van Camp's friend, Sok. Van Camp also identified jewelry belonging to his wife and son. Van Camp testified that his and Sok's firearms functioned properly and were operable.

Later, on two separate dates, the police showed Kuch a photomontage. While viewing one of the photomontages, "[Kuch] told the officer that one picture looked similar to the person that came to rob [her], but the officer said, no, that's not the right guy." V VRP at 673-74. Kuch also testified that the officer showed her another photomontage, and that she identified and signed her name next to a photograph that depicted Nolan Chouap. That montage was admitted into evidence, and Kuch never made an in-court identification of any of the defendants.

C. MAY 10, 2012—OEUNG ROBBERY

On May 10, 2012, at around 5:00 p.m., a woman knocked on the door of Remegio and Norma Fernandez and asked for "John." VII VRP at 949. Remegio [3] looked out a window at the side of the door and told the woman, "John doesn't live here." VII VRP at 949. The woman left and got into a blue, four-door sedan. Remegio described the woman as 20-something, short, chubby, approximately four-foot eight-inches tall, and with light brown skin.

Approximately one hour later, Remegio and Norma were watching television when two men, one armed with a gun, shattered their back door and entered the home. Both men wore black knitted caps and handkerchiefs over their faces. At one point, the gunman lowered his handkerchief for a brief moment, and Remegio could see his whole face.

---

[3] To avoid confusion, we refer to individuals with the same last name by their first names, we mean no disrespect.

When the men entered the house, they ushered the Fernandezes upstairs, held them at gunpoint, and demanded money. Remegio, a 20-year Army veteran, recognized the gun as a 9 mm handgun with a mounted laser-sight. Throughout the time the men were in the home, the gunman repeatedly threated Remegio with the gun, removed the pistol's loaded magazine, and showed Remegio the bullets. While the men searched the rest of the house, both Remegio and Norma heard the second man talking on a "two-way radio" with a woman. VII VRP at 988-90.

At one point, Remegio attempted to escape, but was caught by the gunman, who held the pistol in Remegio's mouth and threatened to kill him. After he attempted to flee, the men bound Remegio's hands and legs, and confined him and Norma in their bathroom, where the gunman held them at gunpoint until he and the other man left. The Fernandezes were in the bathroom for approximately one hour.

Before the intruders left, they told Remegio that they had friends at the Jack-in-the-Box near his home, and that if he did something the friends would come over and beat-up the Fernandezes. The intruders left with the stolen items in backpacks and suitcases taken from the home. The men were in the home for approximately three hours.

The men took more than $5,000 in cash from Remegio's step-daughter's bedroom, all of the gold jewelry in the house, a display samurai sword, an Xbox 360 gaming console, and a .22 caliber pistol. The pistol belonged to Remegio's father, and he testified that he did not know whether it functioned or not.

Shortly after the robbery, Remegio and Norma met with a sketch artist and created two composite sketches, one of the woman who knocked on the door, and one of the gunman. They

also met with detectives to review photomontages of potential suspects. From the photomontage, Remegio identified Nolan Chouap's booking photo as the gunman. Norma also identified the same photo from the photomontage based on the gunman's build.

## II. JAIL HOUSE PHONE CALLS[4]

Dale Vasey served time in the Pierce County Jail where he met Ross,[5] who was his bunkmate. In early July 2012, Vasey read a newspaper article about several home invasion robberies. Vasey loaned the paper to Ross, who also read the article and then showed it to another inmate, stating, "Read this." XII VRP 1765. Ross asked Vasey "if he could hold onto that portion of the newspaper for a while," and shortly after Ross went to the phone bank with the article and made a phone call. XII VRP at 1766-67. Vasey overheard Ross talking with his mother, trying to reach his brother, Azariah Ross. After this incident, Vasey contacted law enforcement and, on July 12, Vasey met with Detective Timothy Griffith, one of the detectives assigned to the home invasion robbery cases.

After Griffith's meeting with Vasey, Ross became a person of interest, and Griffith began listening to his jail phone calls. Griffith located about 15-20 hours of jail phone calls Ross made during his incarceration. The majority of the phone calls were between Ross and his girlfriend, Soy Oeung. They often mentioned Nolan Chouap, also known as "Sneak," "Sneaky," or "Sneaks," Alicia Ngo, also known as "Lisa," and Ross's brother Azariah Ross, also known as "Azzi." XIV VRP 2107-08. Ngo is Azariah's girlfriend and Chouap is a close friend of Oeung and Ross;

---

[4] The State entered 15 recordings into evidence.

[5] Ross was in custody for an unrelated charge.

at the time of the robberies, Oeung, Ross, Azariah, and Ngo all lived in the same home, and occasionally Chouap would reside there as well.

There were four phone calls between Oeung and Ross on May 10, the same day as the robbery at the Fernandezes' home. In the first phone call, Oeung told Ross that, "Az[ariah] said he's gonna pick it, pay, pay him off with some uh ring whatever, pay off your debt the ring whatever money they get for it." Ex. 133, at 00 min., 16 sec.

In the second call, made about 6:14 p.m., Oeung told Ross, "I'm with Az[ariah] and Lisa, they trying to come up right now but I'm outside." Ex. 134, at 00 min., 10 sec. Oeung confirmed that "Nolan" was also with them, and "I told 'em that I would go with them and just knock on the door if they give me some money so I can just put money on your books and they said 'yeah.'" Ex. 134, at 00 min., 17 sec. In the third call, at 7:19 p.m., Oeung is heard saying, "Lisa. Do you want to get me a Jumbo Jack? . . . I got three dollars in my purse." Ex. 135, at 1 min., 40 sec. And, in the final call at 9:40 p.m., Ross asks to talk to "Az[ariah]" and Oeung tells Ross, "He's at, he's in a thing right now." Ex. 136, at 00 min., 15 sec.

The next morning, Ross called Oeung again who said she would wake "Az[ariah]" up because she "got to go sell some gold." Ex. 137, at 00 min., 8 sec. She also confirmed that Azariah "[came] up," that there was "[h]ella gold" and that she's about to sell other items, and Ross's debt is paid off. Ex. 137, at 00 min., 18–53 sec.

In a call on June 6, Oeung expressed her concern to Ross over news reports on a home invasion robbery where a girl "came knocking on the door," and Ross assured her that, "They're

8

lying." Ex. 140, at 00 min., 00–25 sec. In another June phone call, Ross cautioned that "[t]hey're moving too fast." Ex. 141, at 00 min., 10 sec.

On July 4, in a call Ross made to his mother, he stated that he read a newspaper article and "Sneak, Az[ariah] and Lisa are hit right now." Ex. 144, at 01 min., 13 sec. Ross also wanted his mother to purchase the newspaper to read the article.

Griffith then obtained a search warrant to search the contents of Ross's cellphone, which was in Ross's jail property while he was in custody at the Pierce County Jail. Upon examination of the cellphone's data, Detective John Bair recovered a photograph from Ross's phone that Ross sent to Chouap on April 28, 2012. The photograph depicted a number of firearms including shotguns and handguns.

### III. ARREST, POLICE STATEMENTS, AND CHARGES

In August 2012, police officers arrested Ross, Oeung, Azariah, Chouap, and Ngo. After their arrest, Detectives Baker and Griffith interviewed both Oeung and Ross, who, after Baker and Griffith advised them of their Miranda rights, waived their rights, and agreed to make statements.

A. ROSS'S STATEMENT TO POLICE

Ross admitted to driving for two of the home invasion robberies, one on January 25 and another on April 27, 2012. Ross stated that his primary role was to "sit in the car" after he drove Azariah and Chouap to the homes, then to wait and pick them up afterward.

During the January 25 robbery, Azariah and Chouap stole $2,000-$3,000 in cash and gold. Ross, Azariah, and Chouap sold the gold, and Ross admitted to selling gold from other robberies

9

and to taking "Az[ariah] and Lisa" to sell gold. VRP (2/11/2014) at 157. Ross said that he would get between $200 and $300 when he would drive and help sell the gold stolen during the robberies.

Ross admitted driving for two robberies "that I know of where they had guns." VRP (2/11/2014) at 160. Ross admitted to driving for a robbery in April 2012 where guns were stolen from the home. Ross drove Azariah and Chouap to the house knowing that they were going to steal property from the home. Initially, they thought the home was vacant, but Azariah and Chouap told Ross that they encountered someone in the home and shared the details of what happened inside the house. Ngo waited with Ross in the car, and communicated with Azariah on a walkie-talkie while he was inside the home.

Ross said they communicated on walkie-talkies because, "if anybody went to the house, he could contact the people inside much quicker on a walkie-talkie than a cell phone," and, "if there was a shooting inside the residence, Azariah Ross and [Chouap] could call him quicker . . . than a cell phone." VRP (2/11/2014) at 163-64. When Ross picked up Azariah and Chouap after the robbery on April 27, they were carrying a pillowcase and a gun case that contained two shotguns.

After he picked them up, Ross took Azariah and Chouap back to his home, where Ross photographed the stolen weapons with his cellphone, which he sent to Chouap, to assist in selling the guns. Baker and Griffith showed Ross the photograph taken from his cellphone, and Ross admitted that it was the same picture. For his assistance selling gold and driving, Ross stated he received, in total, between $5,000 and $10,000.

10

B. OEUNG'S STATEMENT TO POLICE

During her interview, Oeung initially denied being involved in any home invasion robberies with Azariah or Ngo in May 2012. However, when Baker confronted her about the robbery at the Fernandezes' home on May 10, Oeung admitted that she "had been involved in that one." VRP (2/11/2014) at 90-91.

Oeung admitted to police that, earlier that day, Azariah, Ngo, and Chouap[6] arrived at her mother's home. Ngo drove a blue Dodge Stratus belonging to Azariah's mother, and Ngo drove Oeung, Azariah, and Chouap to 7502 South Ainsworth. Oeung stated that, while riding in the back seat of the car, Azariah, Chouap, and Ngo offered her money to knock on the door of the house and ask for a specific person and she agreed with their plan.

Oeung got out of the car, and as she walked to the front door, she noticed that there was a metal fence around the front of the home. Oeung knocked on the door, and an Asian man "answered the door through the window that was adjacent to the door." VRP (2/11/2013) at 94. Oeung asked for the person she had been told to ask for and returned to the car, telling Azariah, Ngo, and Chouap "that an old man" was in the home. VRP (2/11/2014) at 94. The four then drove around for "approximately 20 to 30 minutes" and parked near the Fernandez home. VRP (2/11/2014) at 95-96. Oeung said that the others, "[S]aid they were going to get something or whatever." VRP (2/11/2014) at 96.

---

[6] Because Chouap, Oeung, and Ross were initially co-defendants, a prior court ruling had redacted Oeung's statement to eliminate any reference to Chouap. *See* Ex. 73; VRP (10/24/2013) at 18-22. Because Chouap is not part of this appeal, and the original, un-redacted statement specifically named him, we use his name to avoid confusion.

Azariah and Chouap got out of the car to "go check out a couple of houses" and Ngo and Oeung waited for them. VRP (2/11/2014) at 96. Oeung said that, when Azariah and Chouap said they were going to go "check out" houses, it meant, "they were going to go take stuff." VRP (2/11/2014) at 96. While they waited for Azariah and Chouap, Ngo drove to Jack-in-the-Box where Oeung ordered a Jumbo Jack, and heard Ngo communicating with Azariah and Chouap on a walkie-talkie. Over the walkie-talkie Ngo asked, "What are you guys doing," and, "When are you coming back?" VRP at (2/11/2014) at 98.

When Azariah and Chouap returned, they were both carrying backpacks. Azariah and Chouap gave Oeung $200 from one of the backpacks. Azariah and Chouap had "a stack of $20 bills about one-half inch thick [and a small] brown envelope." VRP (2/11/2014) at 102. Oeung also saw gold jewelry and cash in the backpacks. Oeung declined to give a recorded or hand-written statement.

C. CHARGES

The State charged Ross with two counts of conspiracy, first degree burglary, first degree robbery, second degree assault, unlawful imprisonment, and first degree trafficking in stolen property, and one count of theft of a firearm for his involvement in the robberies on January 25 and April 27.[7]

The State charged Oeung with one count of conspiracy, one count first degree burglary, two counts first degree robbery, two counts second degree assault, two counts unlawful imprisonment,

---

[7] The State also charged Ross with several counts related to a robbery on August 26, 2012, but later dismissed all but the charges for conspiracy (count LIX) and trafficking (count LXXI).

one count of theft of a firearm, and one count first degree trafficking in stolen property for her involvement in the robbery on May 10, 2012. All of the charges against Ross related to the January and April robberies, and the charges against Oeung related to the May robbery, carried firearms enhancements except for count XXII (Oeung) and count XII (Ross).

## IV. TRIAL

Initially, the State tried Ross, Oeung, and Chouap as co-defendants.[8]

### A. JURY VOIR DIRE—PEREMPTORY CHALLENGES

The trial court instructed counsel that, because it did not "like it to look like there is or isn't collaboration between the defense attorneys," that counsel would "pass a sheet of paper" to exercise their peremptory challenges. IV VRP at 532. The record notes the conference as "Peremptories conducted." IV VRP at 548. The prosecutor and defense documented the jury selection, in the defendants' and the jury's presence, on a document titled "PEREMPTORY CHALLENGES," which was filed with the court. Clerk's Papers (CP) at 788 (Oeung), 765 (Ross).

### B. MOTION FOR MISTRIAL

After nine days of testimony, Chouap pled guilty and was dismissed from the case. Prior to Chouap's plea, Detective Baker testified that Chouap told the police that he "did not always carry a weapon, but when he did, he carried a .38 snub-nose revolver." VRP (2/11/2014) at 147.

After Chouap was no longer a co-defendant in the case, the State moved to admit evidence of property recovered by the police when they executed the search warrant for Ross's residence,

---

[8] The State dropped the charges against Ngo, and the court severed the trial of Azariah based on attorney unavailability.

including evidence of a ".357 Smith & Wesson revolver that was recovered from a curio cabinet in the living room."[9] XII VRP at 1673-74. The State asserted that,

> [W]e do know that a .357 revolver was used because that's what Nolan Chouap said was used in his confession that was . . . referenced to the jury. That's the gun he said he would use, a .357 snub-nosed revolver was the weapon he said he used.

XII VRP at 1678. The trial court allowed admission of the revolver as long as the State could establish that it was a snub-nosed revolver.

After the trial court ruled that the gun evidence that Nolan Chouap admitted to carrying was admissible, the State then introduced the testimony of Detective William Muse. Muse testified that he searched a downstairs bedroom belonging to Ross and Oeung, and the living room on the main floor. In their downstairs bedroom, Muse found a loaded magazine and a trigger lock for a Taurus .44 caliber semiautomatic pistol/handgun. In the living room he found a .38 caliber revolver. Based on the court's prior ruling regarding the evidence of a .357 revolver, defense counsel objected to Muse's testimony and the displayed photograph of the gun.

Outside the presence of the jury, the State admitted that, because Chouap was no long a co-defendant, his confession that he used a .38 revolver in the robberies was inadmissible and could not be used against Ross and Oeung. The trial court ruled that the evidence of the .38 revolver was not admissible because without Chouap's confession, there was no connection between the revolver and the crimes.

Oeung and Ross moved for a mistrial because of the prejudicial nature of the evidence of guns in common areas. The trial court found that the manner in which the firearm was raised was

---

[9] The other evidence the State sought to introduce is not before this court.

14

not "particularly inflammatory." XII VRP at 1744. The trial court denied counsel's mistrial motion, and gave the jury a curative instruction to disregard Muse's testimony about the gun and the photograph of the gun.

C. JURY INSTRUCTIONS

For the firearms enhancement, the trial court gave the jury instruction no. 59 (corrected) for the special verdict forms, which provided,

> If you find the defendant not guilty of a particular count, do not use the corresponding special verdict form for that count. If you find the defendant guilty of a particular count, you will then use the special verdict form for that particular count. In order to answer a special verdict form "yes," all twelve of you must unanimously be satisfied beyond a reasonable doubt that "yes" is the correct answer. If you do not unanimously agree that the answer is "yes" then the presiding juror should sign the section of the special verdict form indicating that the answer has been intentionally left blank.

CP at 300. Neither defendant offered an alternative instruction, nor did they object to the instructions the court gave to the jury.

D. STATE'S CLOSING ARGUMENT

In closing, the State argued its theory of the case that Ross and Oeung were part of a group of people who sought out homes where they knew the residents were at home in order to maximize their profits, and that they entered the homes with real guns. When arguing that the guns were real, the prosecutor stated,

> [Ross] says himself that they were real guns. And if you have any doubt about what he knew, look at his next statement. Why did you use walkie-talkies? We used walkie-talkies for safety reasons. What do you mean safety reasons? Well, I had to be able to get ahold of them on a moment's notice . . . . *Because if they shot someone in the home, I needed to be there ASAP.*

15

XVI VRP at 2252 (emphasis added). Defense counsel objected to the prosecutor's misquote, arguing that "it was not a verbatim quote." XVI VRPR at 2253. Ross actually said they used walkie-talkies to communicate faster "*if there was* a shooting inside the residence," Azariah and Chouap could call him quicker. VRP (2/11/2012) at 163-64 (emphasis added). The trial court sustained the objection and gave a curative instruction,

> With regard to the evidence in the case, folks, it's your interpretation of what was proven and what was not proven that is important. The attorney's remarks, statements and arguments are not evidence in the case as I've instructed you, it's what you remember from the evidence and what you find from the evidence that makes the difference in the case, so you are free to disregard any argument that's contrary to the evidence as you find it.

XVI VRP at 2253.

Shortly thereafter, the prosecutor made a similar argument,

> [Ross] would have realized, this is a home invasion, it's not just a burglary, that's why they have the walkie-talkies, *in case they have to shoot someone* to give each other updates about what is going on.

XVI VRP at 2260 (emphasis added). The State's PowerPoint slides also misquoted Ross's statement regarding the walkie-talkies, using two different statements on eight slides, "'We used walkie talkies so I could come quick in case they shot anyone,'" and "'We used walkie talkies just for safety . . . so I could come quick in case they shot anyone.'" CP at 179, 181, 192, 194, 196, 201, 203, 205.

After the prosecution's initial closing arguments, Ross moved for a mistrial arguing that the State continued to misrepresent the evidence by misquoting Ross. The trial court denied Ross's mistrial motion, stating that the State's arguments were reasonable interpretations of the evidence.

16

During closing argument, defense counsel corrected Ross's statement,

So, the State went on ad nauseam about this statement that Mr. Ross made about shooting inside, and the using of the walkie-talkies. The actual statement that was testified to by Detective Baker was: Azias Ross also mentioned that if there was shooting inside the house, the suspects inside could call him more quickly.

That is not the same as if they shot someone inside the house. There can be numerous ways that a shooting can occur inside a home, a homeowner could come home and have a gun. A neighbor could see someone breaking in and go over there with a shotgun. Police could be called and they could respond and they could have shots fired. A shooting inside cannot be extrapolated to: well, he knew they had guns, and he knew they had walkie-talkies in case they shot someone inside. That is not what he said.

XVI VRP at 2285.

E.  STATE'S REBUTTAL ARGUMENT

In the State's rebuttal argument, the prosecutor argued to the jury,

[Y]ou don't have to be convinced about every detail of things, but you do have to be convinced beyond a reasonable doubt as to the elements.

One of the first things that I asked . . . was, you know, I want to know what you think about the truth, how important is the truth in our system? . . . Everybody agreed, it's the basics of whether our system's effective and works fairly for everybody is an understanding of the truth. Without it, you just don't have justice, right?

As relates to the elements, again, what truth? . . . [T]he state does have to satisfy you regarding the truth of those elements.

. . . .

So, that slate is full. And you need to carefully evaluate those feelings, those understandings that you have and how they apply to this case, what the State's proven, what happened in this case, and compare that, of course, to this legal standard of beyond a reasonable doubt.

. . . .

[The trial court's reasonable doubt instruction] says a reasonable doubt is one for which a reason exists, it may arise from the evidence or lack of evidence. It is such a doubt as would exist in the mind of a reasonable person after fully, fairly, and carefully considering all of the evidence or lack of evidence.

> If from such consideration you have an abiding belief in the truth of the charge, which are the elements, you are satisfied beyond a reasonable doubt. So that means [when you come to an individual and collective decision] it has to be a decision that you have an abiding belief in the truth of. [The verdict cannot change once it is rendered, and when the jurors look back they are] still satisfied to that day in the truth of the verdict based on the law.

XVI VRP at 2348-51. Defense counsel objected to the prosecutor's apparent "second closing argument" and the "dangerous territory" of the "truth highway," which the trial court neither sustained nor overruled. XVI VRP at 2351. The trial court admonished the prosecutor and gave the jury the following instruction:

> The concept of abiding belief is only with regard to the prosecution's burden and the defense, I remind the jury, doesn't have to prove anything. The State has to prove the case beyond a reasonable doubt. My instructions explain to you what reasonable doubt is.

XVI VRP at 2351-52. The trial court previously had instructed the jury that their decisions "must be made solely upon the evidence presented." CP at 232.

At the end of his rebuttal argument, the prosecutor stated, "And in this case the State is confident that based on the evidence in this case, and the law, these defendants are all guilty of all crimes charged." XVI VRP at 2352. The defense did not object.

F. VERDICT

The jury convicted Oeung of one count each of conspiracy (count XIV), first degree burglary (count XV), theft of a firearm (count XXII), and trafficking in stolen property (count XXIII), and two counts each of first degree robbery (counts XVI, XVII), second degree assault (counts XVIII, XIX), and unlawful imprisonment (counts XX, XXI). The jury found that for all of

the counts with a firearm enhancement, the enhancement applied, answering "yes" on the special verdict forms.

The jury found Ross guilty of two counts each of conspiracy (counts I, VII), first degree burglary (counts II, VIII), first degree robbery (counts III, IX), second degree assault (counts IV, X), unlawful imprisonment (counts V, XI), and trafficking in stolen property (counts VI, XIII). The jury also found that each charge carried a firearm enhancement, answering "yes" on the special verdict forms. The jury also convicted Ross of one count of theft of a firearm (count XII).[10]

## V. SENTENCING

### A. DISMISSED CHARGES – DOUBLE JEOPARDY

The jury convicted both Oeung and Ross of two counts of second degree assault and first degree robbery.[11] The sentencing court found that Oeung's and Ross's convictions for the second degree assault charges (Oeung, counts XVIII, XIX. and Ross, counts IV, X), violated double jeopardy based on their convictions for first degree robbery (Oeung, counts XVI, XVII, and Ross, counts III, IX ). The sentencing court further found that Ross's second conviction for conspiracy to commit burglary (count VII) and conviction for unlawful imprisonment (count V) violated

---

[10] With regard to the charges related to an August 2012 robbery, the jury acquitted Ross of conspiracy to commit burglary (count LIX), but convicted him of trafficking in stolen property (count LXXI) and answered "yes" to the firearm enhancement for that conviction. The rest of the charges relating to August 26 were dismissed with prejudice (counts LX-LXX). Ross does not appeal any of his trafficking convictions, or their enhancements, including his conviction related to the August robbery.

[11] In addition to finding Oeung and Ross guilty of the two charges of second degree assault (counts XVIII, XIX (Oeung) and counts IV, X (Ross)), the jury also found that the firearms enhancement on the second degree assault charges applied.

double jeopardy given his convictions on counts I and III related to the January 25 robbery. The sentencing court dismissed the offending convictions for counts IV, V, VII, X, XVIII, and XIX without prejudice.

The jury returned a second verdict against Oeung for her conspiracy charge in count XIV, filling in two identical verdict forms with "guilty." But Oeung was only charged with one count of conspiracy, and the sentencing court entered judgment and sentence for only the single count.

B. MERGER AND SAME CRIMINAL CONDUCT

At sentencing, Oeung and Ross argued that some of their charges should merge or be considered the same criminal conduct for calculating their offender scores.

Oeung's counsel argued that, because the Fernandezes were not "moved to a different location" and their restraint was incidental to accomplishing the robbery, the sentencing court should consider that Oeung's unlawful imprisonment conviction merged with her first degree robbery conviction. VRP (6/23/2014) at 30. Ross's counsel argued similarly, that his first degree robbery and unlawful imprisonment convictions relating to the April 27 robbery should merge. The court disagreed, ruling that the crimes did not merge.[12]

Oeung and Ross then argued that the court should find that their first degree robbery and burglary convictions constituted the "same criminal conduct" under RCW 9.94A.589(1)(a). VRP (6/23/2014) at 39-42. The court disagreed and found that, under "[t]he case law and the statute," burglary and robbery are separate offenses.

---

[12] The sentencing court did find that Ross's unlawful imprisonment conviction for the January 25 incident was incidental and did merge with his other convictions and dismissed this conviction without prejudice.

20

C. OEUNG'S REQUEST FOR MITIGATED SENTENCE

Oeung requested that a sentence be imposed only for the firearms enhancements, rather than the standard range sentence of 417 months, plus a firearms enhancement. To support her request for an exceptional downward sentence under RCW 9.94A.535(1)(d-g), Oeung cited her "personal and cultural background" as indicated in the mitigation report. CP at 339, 348-52. She argued that she was "tempted by the lure of easy money," that her judgment was clouded by drug addiction, she had a history of childhood abuse, that her "lesser degree of participation" did not put anyone in direct danger, and that the potential sentence including the firearms enhancements was excessive compared to her culpability. CP at 339-40; VRP (6/23/2014) at 63.

The sentencing court, while sympathetic to Oeung's personal background, stated that her "terrible background" did not support a mitigated sentence, agreed with the State that, while her role was minimal when compared to her accomplices, her overall participation was not minimal. VRP (6/23/2014) at 55. The court denied her request for an exceptional downward mitigated sentence and imposed a sentence of 417 months, 129 months for Oeung's substantive crimes and 288 months for the firearms enhancements.

Oeung appeals all of her convictions and firearms enhancements, and Ross appeals his convictions for conspiracy, first degree robbery, first degree burglary, theft of a firearm, and unlawful imprisonment and their related firearms enhancements. Ross also filed a statement of additional grounds (SAG).

ANALYSIS

I. PUBLIC TRIAL RIGHT

Oeung and Ross argue that the parties' exercise of written peremptory challenges violated their rights to a public trial. We disagree.

Our Supreme Court has held that the trial court does not violate the defendant's right to a public trial when peremptory challenges are made on paper or during a sidebar and a record of the challenges is filed with the court. *State v. Love*, 183 Wn.2d 598, 607, 354 P.3d 841 (2015) *cert. denied*, 136 S. Ct. 1524 (2016).

As in *Love*, the trial court here conducted peremptory challenges on paper at a sidebar. The prosecutor and defense documented the jury selection in a document titled "PEREMPTORY CHALLENGES," which was then filed with the court. CP at 788. Under *Love*, we hold that Oeung and Ross were not deprived of their right to public trial.

II. MISTRIAL

Oeung and Ross argue that the trial court erred when it denied their motion for a mistrial after the jury heard from Detective Muse that he found a .38 caliber revolver during a search of Ross's home. We disagree; the trial court properly denied the motion, the evidence that was stricken was not unfairly prejudicial, and the trial court gave a curative instruction.

A. STANDARD OF REVIEW

We review a trial court's denial of a motion for mistrial for abuse of discretion. *State v. Garcia*, 177 Wn. App. 769, 776, 313 P.3d 422 (2013). We will find an abuse of discretion only when "'no reasonable judge would have reached the same conclusion,'" and overturn a trial court's

denial of a mistrial motion only when there is a substantial likelihood that the error affected the jury's verdict. *State v. Emery*, 174 Wn.2d 741, 765, 278 P.3d 653 (2012) (internal quotation marks omitted) (quoting *State v. Hopson*, 113 Wn.2d 273, 284, 778 P.2d 1014 (1989)); *Garcia*, 177 Wn. App. at 776. A trial court should only order a mistrial when the defendant has been so prejudiced that only a new trial insures that the defendant receives a fair trial. *Garcia*, 177 Wn. App. at 776.

When reviewing a trial court's denial of a mistrial, we examine the following three *Hopson* factors to determine whether an irregularity warrants a mistrial: "'(1) [the irregularity's] seriousness, (2) whether [the irregularity] involved cumulative evidence, and (3) whether the trial court properly instructed the jury to disregard it.'" *Garcia*, 177 Wn. App. at 776 (internal quotation marks omitted) (quoting *Emery*, 174 Wn.2d at 765)).

B. SERIOUSNESS OF THE IRREGULARITY

Under the first *Hopson* factor—seriousness of the irregularity—we review erroneously admitted evidence to determine whether the irregularly materially affected the outcome of the trial. *Hopson*, 113 Wn.2d at 284-85. An error in admitting evidence does not necessarily require reversal if it meets the harmless error standard. *Hopson*, 113 Wn.2d at 285. A non-constitutional error is harmless unless, "'within reasonable probabilities,'" the error materially affected the outcome of the trial. *Hopson*, 113 Wn.2d at 285 (quoting State v. Smith, 106 Wn.2d 772, 780, 725 P.2d 951 (1986)). Because Chouap pled guilty, his admission that he carried a ".38 sub-nosed revolver" was no longer admissible and could not be used against either Oeung or Ross. VRP (2/11/2014) at 147; *See e.g., Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004) (providing the criminal defendant the right to confrontation); *Grey v. Maryland*, 523 U.S. 185, 118

S. Ct. 1151, 140 L. Ed. 2d 294 (1998) (providing that one co-defendant's statement cannot be used to incriminate the other).

Before Chouap plead guilty and was dismissed from the case, the jury heard evidence that he admitted to using a .38 caliber revolver in the robberies. Based on this confession, the trial court later allowed Detective Muse to testify about a .38 caliber revolver he found in a search of Ross's home and the State admitted a photograph of the gun. After defense counsel objected, the trial court realized that Chouap's confession could not be used against Oeung and Ross, and that without that confession, the State would be unable to show a connection between the .38 caliber revolver and the crimes. The trial court sustained defense's objection to the revolver, but denied the defense's mistrial motion because it found that this firearm evidence was of "little significance" and believed that the jury could follow a curative instruction. The trial court then instructed the jury to disregard both Muse's testimony and the photograph of the gun.

Applying the harmless error standard, it is unlikely that the jury's brief exposure to the photograph and testimony that Muse found the .38 caliber revolver in Ross's home materially affected the outcome of the trial. *Hopson*, 113 Wn.2d at 285. We also presume that the jury followed the trial court's instructions. *Hopson*, 113 Wn.2d at 287.

C.  CUMULATIVE EVIDENCE

Under the second *Hopson* factor, even if the improperly admitted evidence is cumulative, a mistrial may not be necessary. *Garcia*, 177 Wn. App. at 781 (citing *Hopson*, 113 Wn.2d at 284).

There were a number of firearm components found in Oeung's and Ross's immediate living space and within the house matching the make and model of firearms stolen in one of the robberies.

24

Ross admitted that he knew of at least two robberies where his accomplices used guns and he took photos of the stolen firearms to sell. Further, Azariah and Chouap were armed when they entered the Fernandez residence, shortly after leaving the car where Oeung was riding with them.

Thus, Muse's testimony and the photograph of the .38 caliber revolver were cumulative of properly admitted evidence, including Oeung's and Ross's own admissions, that they had access to firearms and that they knew their accomplices used firearms in the robberies. *See Emery*, 174 Wn.2d at 766 (stating that co-defendant's outbursts as to appellant's credibility at trial were cumulative of properly admitted evidence and did not warrant a mistrial).

D. CURATIVE INSTRUCTION

Under the third *Hopson* factor, an instruction may or may not be sufficient to cure an irregularity and avoid a mistrial. *State v. Perez-Valdez*, 172 Wn.2d 808, 818, 265 P.3d 853 (2011); *Garcia*, 177 Wn. App at 782. A curative instruction that does not expressly direct the jury to disregard the improper evidence, does not remove the prejudicial effect of improper evidence. *State v. Young*, 129 Wn. App 468, 477, 119 P.3d 870 (2005).

Here, the trial court specifically instructed the jury to "disregard both the testimony and the [photograph] from the exhibit that was being displayed, please." XII VRP at 1746. Absent evidence to the contrary, we presume that the jury followed the trial court's instructions. *State v. Kirkman*, 159 Wn.2d 918, 928, 155 P.3d 125 (2007).

E. APPLICATION OF THE *HOPSON* FACTORS

When applying the *Hopson* factors, we give deference to the trial court who is in the best position to determine the existence of prejudice. *Garcia*, 177 Wn. App. at 777. Applying the

25

*Hopson* factors requires a balancing approach, neither factor outweighs the other. *Garcia*, 177 Wn. App. at 783. Not every irregularity in trial, even a serious one, triggers a mistrial because defendants are entitled to fair, not perfect, trials. *Garcia*, 177 Wn. App at 784-85. In the context of the entire case, improperly admitted evidence, while a serious irregularity, may not materially affect the outcome of trial. *State v. Gamble*, 168 Wn.2d 161, 177, 225 P.3d 973 (2010).

Although the *Hopson* factors apply to improperly admitted evidence, here the evidence of the .38 caliber revolver was stricken, not admitted, and based on the prior analysis, we hold that it is unlikely that the evidence of the .38 caliber revolver affected the jury's verdict. Because we defer to the trial court when applying the *Hopson* factors, we cannot conclude on this record that "no reasonable judge would have denied the mistrial motion." *Garcia*, 177 Wn. App. at 784. Viewing the admission of the .38 caliber revolver in the context of the entire case, there is no indication that Oeung and Ross were denied a fair trial or that the irregularity materially affected the trial's outcome. *Garcia*, 177 Wn. App at 784-85; *Gamble*, 168 Wn.2d at 177. The admission of the .38 caliber revolver evidence was not so serious as to be incurable by the trial court's instruction to disregard Muse's testimony and the gun photograph; and that instruction, which the jury is presumed to follow, limited any potential prejudice to Oeung and Ross. The trial court did not abuse its discretion when it denied Oeung's and Ross's mistrial motion.

### III. PROSECUTORIAL MISCONDUCT

Oeung and Ross argue that the prosecutor committed misconduct during closing arguments when he (1) mischaracterized evidence by misquoting Ross's statements, (2) made "truth" comments during rebuttal argument, and (3) stated an improper opinion on Oeung's and Ross's

guilt. We agree that the misquoted statements and truth comments were improper, but disagree that the prosecutor stated an improper opinion on Ross's guilt, and hold that Oeung and Ross fail to prove that the improper comments were prejudicial.

## A. LEGAL PRINCIPLES

The right to a fair trial is a fundamental liberty guaranteed by both the federal and state constitutions. U.S. CONST. amend. VI, XIV; WASH. CONST. art. I, § 22; *In re Glasmann*, 175 Wn.2d 696, 703, 286 P.3d 673 (2012). Prosecutorial misconduct may deprive a defendant of his constitutional right to a fair trial. *Glasmann*, 175 Wn.2d at 703-04.

We review allegations of prosecutorial misconduct for abuse of discretion. *State v. Lindsay*, 180 Wn.2d 423, 430, 326 P.3d 125 (2014). The defendant bears the burden to prove that the prosecutor's comments were both improper and prejudicial in the context of the entire trial. *Lindsay*, 180 Wn.2d at 430-31; *State v. Thorgerson*, 172 Wn.2d 438, 442, 258 P.3d 43 (2011). Failure to object to alleged improper comments, or failure to request a curative instruction, fails to preserve claim of misconduct unless the comments were "so flagrant and ill-intentioned" that no jury instruction would cure any resulting prejudice. *State v. Sakellis*, 164 Wn. App. 170, 184-85, 269 P.3d 1029 (2011) (abandoning "waiver" in favor of "failure to preserve" a claim of prosecutorial misconduct); *State v. Stenson*, 132 Wn.2d 668, 726-27, 940 P.2d 1239 (1997). To establish prejudice, the defendant must prove that there is a substantial likelihood that the misconduct affected the jury's verdict. *Thorgerson*, 172 Wn.2d at 442-43.

The prosecutor has wide latitude in closing argument to draw reasonable inferences from the evidence and express such inferences to the jury. *Stenson*, 132 Wn.2d at 727. "Closing

27

argument provides an opportunity to draw the jury's attention to the evidence presented, but it does not give a prosecutor the right to present altered versions of admitted evidence to support the State's theory of the case." *State v. Walker*, 182 Wn.2d 463, 478, 341 P.3d 976 (2015) *cert. denied*, 135 S. Ct.2844 (2015); (citing *Glasmann*, 175 Wn.2d at 706-07). We review the prosecutor's comments during closing argument in the context of the entire argument, the issues, the evidence addressed in the argument, and the jury instructions. *Sakellis*, 164 Wn. App. at 185.

B. MISCHARACTERIZED EVIDENCE

Oeung and Ross argue that the prosecutor committed misconduct during closing argument when he "mischaracterized key evidence" by misquoting Ross's statement to police about the walkie-talkies and misquoted him on eight PowerPoint slides. We agree that the prosecutor's comments were improper, but hold that Oeung and Ross fail to show prejudice.

Ross told police that he and his accomplices used walkie-talkies during the robberies to communicate with each other when his accomplices were inside homes, the walkie-talkies facilitated faster communication, and "if there was a shooting" Azariah and Chouap could call Ross quicker. VRP (2/11/2012) at 163-64. During closing, the prosecutor argued,

> [Ross] says himself that they were real guns. And if you have any doubt about what he knew, look at his next statement. Why did you use walkie-talkies? We used walkie-talkies for safety reasons. What do you mean safety reasons? Well, I had to be able to get ahold of them on a moment's notice . . . . Because *if they shot someone in the home,* I needed to be there ASAP.

XVI VRP at 2252 (emphasis added). Defense counsel objected to the prosecutor's misquote, XVI VRP at 2253, and the trial court offered the following curative instruction,

> With regard to the evidence in the case, folks, it's your interpretation of what was proven and what was not proven that is important. The attorney's remarks,

28

statements and arguments are not evidence in the case as I've instructed you, it's what you remember from the evidence and what you find from the evidence that makes the difference in the case, so you are free to disregard any argument that's contrary to the evidence as you find it.

XVI VRP at 2253.[13]

Shortly after, the prosecutor made the following argument,

[Ross] would have realized, this is a home invasion, it's not just a burglary, that's why they have the walkie-talkies, *in case they have to shoot someone* to give each other updates about what is going on.

XVI VRP at 2260. The State's PowerPoint slides also misquoted Ross's statements about the walkie-talkies, using two different statements on eight slides, "We used walkie talkies so I could come quick in case they shot anyone," and "We used walkie talkies just for safety . . . so I could come quick in case they shot anyone." CP at 179, 181, 192, 194, 196, 201, 203, 205.

After the prosecution's initial closing arguments, Ross moved for a mistrial because even after the trial court's curative instruction, he argued that the State continued to misrepresent the evidence. The trial court denied Ross's motion, ruling that the State's arguments were reasonable interpretations of the evidence.

During his closing argument, defense counsel corrected Ross's statements

So, the State went on ad nauseam about this statement that Mr. Ross made about shooting inside, and the using of the walkie-talkies. The actual statement that was testified to by Detective Baker was: Azias Ross also mentioned that if there was shooting inside the house, the suspects inside could call him more quickly.

---

[13] Even if the trial court's instruction was imperfect, imperfect instructions can cure potential prejudice from a prosecutor's improper statements. *State v. Warren*, 165 Wn.2d 17, 28, fn.5, 195 P.3d 940 (2008). In addition, the trial court's written instructions to the jury informed the jury that counsel's arguments were not evidence.

That is not the same as if they shot someone inside the house. There can be numerous ways that a shooting can occur inside a home, a homeowner could come home and have a gun. A neighbor could see someone breaking in and go over there with a shotgun. Police could be called and they could respond and they could have shots fired. A shooting inside cannot be extrapolated to: well, he knew they had guns, and he knew they had walkie-talkies in case they shot someone inside. That is not what he said.

XVI VRP at 2285.

The State's misquoted statements were improper. But the trial court instructed the jury that the argument was not evidence and they should disregard any argument to the contrary, and we presume that the jury follows the court's instructions. *Emery*, 174 Wn.2d at 766 (citing *State v. Anderson*, 153 Wn. App. 417, 220 P.3d 1273 (2009)). Further, the prosecutor's misstatements were few. Oeung and Ross fail to prove that the prosecutor's statements, while improper, resulted in prejudice, affected the verdict, and denied them a fair trial.

C. "TRUTH" STATEMENTS

Oeung and Ross argue that the prosecutor's "truth" statements in the State's rebuttal closing argument were improper, misstated the jury's role, shifted the State's burden of proof, and denied them a fair trial. We disagree.

"'[A] jury's job is not to 'solve' a case . . . . [R]ather, the jury's duty is to determine whether the State has proved its allegations against a defendant beyond a reasonable doubt.'" *State v. McCreven*, 170 Wn. App. 444, 472-73, 284 P.3d 793 (2012) (alternations in original, internal quotations omitted) (quoting *State v. Walker*, 164 Wn. App. 724, 733 265 P.3d 191 (2011)). A prosecutor should not argue to the jury that it must "'declare'" or "'decide'" the truth. *McCreven*, 170 Wn. App at 473 (quoting *Walker*, 164 Wn. App. at 733). However, "[u]rging the jury to render

a just verdict that is supported by evidence is not misconduct." *State v. Curtiss*, 161 Wn. App. 673, 701, 250 P.3d 496 (2011).

The prosecutor's "truth" remarks here are a hybrid of those made by the prosecutors in *Curtiss* and *McCreven*. In *McCreven*, the prosecutor argued to the jurors that they must "determine whether they have an abiding belief in the truth of the charge . . . truth in what each of these defendants did." 170 Wn. App at 473. We held that those remarks were improper and that the trial court erred in overruling the defense's objection to the improper remarks. *McCreven*, 170 Wn. App. at 473.

In *Curtiss*, at the end of the State's closing argument, the prosecutor asked the jury to "speak the truth," and argued that the trial was "a search for the truth and a search for justice" and that the evidence was overwhelming. 161 Wn. App at 701. The prosecutor then asked the jury to "return a verdict that you know is just." *Curtiss*, 161 Wn. App. at 701. We held that the "truth" remarks were not misconduct because the State asked the jury to return a verdict supported by the evidence and because "courts frequently state that a criminal trial's purpose is a search for truth and justice." *Curtiss*, 161 Wn. App. at 701-02 (citing *Strickler v. Greene*, 527 U.S. 263, 281, 119 S. Ct. 1936, 144 L. Ed. 2d 2868 (1999)).

The prosecutor here stated that one of the first things asked was, "[H]ow important is the truth in our system?" XVI VRP at 2348. The prosecutor correctly stated its burden of proof, arguing that the State had to "satisfy [the jury] regarding the truth of the elements." XVI VRP at 2348. The prosecutor then read the reasonable doubt instruction and argued that the jurors had to

"have an abiding belief in the truth of the charge" and believe in the "truth" of their decision and verdict "based on the law." XVI VRP at 2351.

Defense counsel objected, and the court overruled Ross's objection, but admonished the prosecutor and gave the following curative instruction:

> The concept of abiding belief is only with regard to the prosecution's burden and the defense, I remind the jury, doesn't have to prove anything. The State has to prove the case beyond a reasonable doubt. My instructions explain to you what reasonable doubt is.

XVI VRP at 2351-52. The court also instructed the jury that its decisions, "must be made solely upon the evidence presented." CP at 232 (Instruction no. 1). The instructions defined the State's burden of proof and reasonable doubt,

> The State is the plaintiff and has the burden of proving each element of each crime beyond a reasonable doubt.

> A defendant is presumed innocent[, and the presumption continues unless overcome by evidence beyond a reasonable doubt].

> A reasonable doubt is one for which a reason exists[, and after considering all of the evidence], you have an abiding belief in the truth of the charge, you are satisfied beyond a reasonable doubt.

CP at 235 (Instruction no. 2).

While the prosecutor argued that the jurors had to "have an abiding belief in the truth of the charge," he also argued that the jurors could only believe in the truth of the charge if they found that the evidence supported it. XVI VRP at 2351. While the trial court did not sustain Ross's objection, the instructions correctly informed the jury of the State's burden, the presumption of innocence, and the definition of reasonable doubt; and we presume that the jury follows the court's instructions. *Emery*, 174 Wn.2d at 766. While the prosecutor's "abiding belief" remarks may have

been improper, Oeung and Ross fail to show that they had a substantial likelihood of affecting the jury's verdict. *Thorgerson*, 172 Wn.2d at 442-43.

D. IMPROPER OPINION

Oeung and Ross argue that the prosecutor expressed an improper opinion on their guilt[14] during rebuttal argument, denying them a fair trial. We disagree.

A prosecutor commits misconduct by asserting his personal opinions on a defendant's guilt. *Walker*, 182 Wn.2d at 478 (citing *Glasmann*, 175 Wn.2d at 706-07). RPC 3.4(e) prohibits a prosecutor from stating his opinion on the guilt or innocence of the accused. But because they did not object to the prosecutor's statement, they must show that the statement was, so flagrant and ill-intentioned as to be incurable by the jury instruction. *Sakellis*, 164 Wn. App. at 184.

The prosecutor may argue reasonable inferences from the evidence. *Walker*, 182 Wn.2d at 476-77. It is a reasonable inference for the prosecutor to argue that the State is confident that, based on the evidence presented at trial and the law, the jury will find a defendant guilty. Thus, the prosecutor's remarks were not improper.

E. CUMULATIVE ERROR

Oeung and Ross argue that the cumulative effects of the State's misconduct denied them a fair trial. We disagree.

The cumulative error doctrine applies where a trial is affected by several errors that, standing alone, may not be sufficient to justify reversal. *State v. Greiff*, 141 Wn.2d 910, 929, 10 P.3d 390

---

[14] In rebuttal closing, the prosecutor stated, "And in this case the State is confident that based on the evidence in this case, and the law, these defendants are all guilty of all crimes charged." XVI VRP at 2352.

(2000). The doctrine requires reversal where the combination of errors denied the defendant a fair trial. *Greiff*, 141 Wn.2d at 929. But reversal is not required when there are few or no errors, and the errors, if any, have little to no effect on the outcome of trial. *State v. Weber*, 159 Wn.2d 252, 279, 149 P.3d 646 (2006).

Any errors in Oeung's and Ross's trial were limited as discussed above, and did not have any effect on the outcome of their trial. Thus, Oeung and Ross fail to demonstrate any prejudice, and their claim of prosecutorial misconduct fails.

## IV. INSUFFICIENCY OF THE EVIDENCE

Oeung and Ross jointly argue that there was insufficient evidence to convict them of accomplice liability for theft of a firearm, and the firearm enhancements for the conspiracy convictions. Oeung separately argues that, under the rule of *corpus delecti*, there was insufficient independent evidence outside of her own incriminating statements to police to convict her of conspiracy to commit first degree burglary or first-degree robbery, and that there is insufficient evidence to support the firearms enhancements on her remaining eight convictions.[15] Ross argues separately that there was insufficient evidence to establish that the alleged firearm used in the January 25 robbery was operable.[16] We disagree.

## A. STANDARDS OF REVIEW AND LEGAL PRINCIPLES

When considering a challenge to the sufficiency of the State's evidence, this court determines, whether, after viewing the evidence in the light most favorable to the prosecution, *any*

---

[15] Counts XV–XIV, XX, XXI, and XXIII.

[16] Ross also includes this argument in his SAG.

rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Condon*, 182 Wn.2d 307, 314, 343 P.3d 357 (2015). When a criminal defendant challenges the sufficiency of the evidence, this court must draw all reasonable inferences from the evidence in favor of the State and interpret them most strongly against the defendant. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). "A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn [from it]." *Salinas*, 119 Wn.2d at 201. Circumstantial evidence and direct evidence are equally weighted. *State v. Goodman*, 150 Wn.2d 774, 781, 83 P.3d 410 (2004).

B. ACCOMPLICE LIABILITY – THEFT OF A FIREARM

A person is liable as an accomplice if, "[w]ith knowledge that it will promote or facilitate the commission of the crime," that person encourages, aids, or agrees to aid in the commission of the crime. RCW 9A.08.020(3)(a). The accomplice liability statute is not a strict liability statute, and our courts have stated that accomplice liability requires a general knowledge that the person was "promoting or facilitating *the* crime" for which the person was eventually charged. *State v. Cronin*, 142 Wn.2d 568, 579, 14 P.3d 752 (2000); *See also State v. Roberts*, 142 Wn.2d 471, 513, 14 P.3d 713 (2000).

The accomplice must "'have the purpose to promote or facilitate *the particular conduct that forms the basis for the charge.*'" *Roberts*, 142 Wn.2d at 510 (quoting Model Penal Code § 2.06 cmt. 6(b) (1985)). Specific knowledge of each element of the principal's is not necessary to convict a person as an accomplice. *Roberts*, 142 Wn.2d at 513. "[T]he specific criminal intent of the

accused may be inferred from the conduct where it is plainly indicated as a matter of logical probability." *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980).

Under RCW 9A.56.300,

(1) A person is guilty of theft of a firearm if he or she commits a theft of any firearm.
(2) This section applies regardless of the value of the firearm taken in the theft.
(3) Each firearm taken in the theft under this section is a separate offense.

The definition of "theft" and defense allowed against a prosecution for theft under RCW 9A.56.020 also applies to theft of a firearm. RCW 9A.56.300(4). "Theft" means to wrongfully obtain or exert unauthorized control over the property or services of another or the value thereof, with intent to deprive him or her of such property or services. RCW 9A.56.020(1)(a).

Ross admitted that he drove Azariah and Chouap to the Kuch home on April 27 and that he knew what Azariah and Chouap were going to do when they entered the home. The men stole eight firearms from the home including a .40 caliber pistol, two 9 mm pistols, shotguns, and a .357 snub-nose revolver. After the robbery, Ross stated that Azariah and Chouap were carrying a pillowcase and a gun case that contained two shotguns. Ross then drove them to his house where he used his phone to take photographs of the guns to try to sell the stolen firearms.

Additionally, there was evidence that Oeung aided her accomplices Azariah and Chouap with the knowledge that they were going to enter the Fernandez home "to get something or whatever." VRP (2/11/2012) at 95. After Oeung knocked on the door of the home, Azariah and Chouap stole, among other things, a .22 caliber pistol.

Oeung and Ross both argue that the State needed to prove that each of them had specific knowledge that firearms would be stolen. We disagree. The legislature specifically incorporated

36

the definition of theft into RCW 9A.56.300, and Oeung and Ross needed to only have the purpose to facilitate the underlying conduct of theft, and general knowledge that some property would be taken. *Roberts*, 142 Wn.2d at 510, 513.

The court also instructed the jury that, "The State is not required to prove an accomplice had knowledge a firearm would be taken during the theft," and that the charged accomplice needed only a general knowledge that a theft would occur. CP at 240 (Instruction no. 7). Neither Oeung nor Ross objected to instruction no. 7 or assigned error to this instruction on appeal, and thus, under the law of the case doctrine, they are bound by the instruction. *State v. Hickman*, 135 Wn.2d 97, 105, 954 P.2d 900 (1998) (discussing *State v. Dent*, 123 Wn.2d 467, 869 P.2d 392 (1994)).

To be convicted as accomplices, Oeung and Ross needed to know that Azariah and Chouap were going to commit a theft, they did not need to have knowledge of each element of the crime in order to be convicted under RCW 9A.080.020. *Roberts*, 142 Wn.2d at 513. Thus, we hold that there was sufficient evidence to convict Oeung and Ross of theft of a firearm under accomplice liability.

C.  FIREARMS ENHANCEMENTS

Oeung and Ross argue that there was insufficient evidence to support their firearms enhancements for their conspiracy convictions. Oeung and Ross also argue that there was insufficient evidence to support their firearms enhancements for their other convictions—Oeung, for her convictions relating to the May 10 robbery; and Ross, for his convictions related to the January 25 robbery. We disagree.

37

1. Legal Principles

A defendant may be convicted of a firearm enhancement if the defendant, *or an accomplice*, was armed with a firearm as defined in RCW 9.41.010. RCW 9.94A.533(4). A "firearm" is "'a weapon or device from which a projectile may be fire by an explosive such as gunpowder.'" *State v. Pierce*, 155 Wn. App. 701, 714, 230 P.3d 237 (2010) (internal quotation marks omitted) (quoting *State v. Recuenco*, 163 Wn.2d 428, 437, 180 P.3d 1276 (2008)). Because Oeung and Ross did not challenge the jury instructions at trial, our review is limited to whether there was sufficient evidence for any rational trier of fact to find beyond a reasonable doubt that one or more of the defendants were armed. *State v. O'Neal*, 159 Wn.2d 500, 504, 150 P.3d 1121 (2007).

"'A defendant is armed when he or she is within proximity of an easily and readily available deadly weapon for offensive or defensive purposes and when a nexus is established between the defendant, the weapon, and the crime.'" *O'Neal*, 159 Wn.2d at 503-04 (internal quotation marks omitted) (quoting *State v. Schelin*, 147 Wn.2d 562, 575-76, 55 P.3d 632 (2002)). A defendant can be in constructive possession of a firearm if it is "easily accessible and readily available" when the prohibited conduct occurs. *Schelin*, 147 Wn.2d at 574.

Under a two-part analysis, there must be a nexus between the defendant and the weapon, and between the weapon and the crime. *Schelin*, 147 Wn.2d at 568. Direct evidence is not required to uphold the jury's verdict; circumstantial evidence can be sufficient. *O'Neal*, 159 Wn.2d at 506. The State does not need to establish with mathematical precision the specific time and place that a weapon was readily available and readily accessible, so long as it was at the time of the crime. *O'Neal*, 159 Wn.2d at 504-05. Knowledge *may* be a factor for the jury to consider in determining

38

whether there is a connection between the defendant, the crime, and the weapon. *State v. Barnes*, 153 Wn.2d 378, 386-87, 103 P.3d 1219 (2005).

2. Conspiracy—First Degree Robbery and Burglary with a Firearm

Oeung and Ross argue that there was insufficient evidence either that they, or their accomplices, were armed at the time of their conspiracy, or that there is proof of a nexus between any firearms and any agreement to commit first degree robbery or first degree burglary. We disagree. The evidence shows that the firearms were accessible and available for use when Oeung and Ross entered their agreements with their co-conspirators, and that it is a reasonable inference from the evidence that both Oeung and Ross knew that their accomplices were armed.

The State has the burden to prove that the defendant or an accomplice was armed with a firearm at the time the agreement was made to commit first degree robbery. *Barnes*, 153 Wn.2d at 386.

The State charged both Oeung and Ross with conspiracy to commit first degree robbery while armed with a firearm. Circumstantial evidence linked both Oeung and Ross to the firearms and the firearms to the conspiracy. First, the defendants were all known to each other. Further, police discovered a loaded pistol magazine for a .44 caliber Taurus semi-automatic handgun in Oeung and Ross's bedroom in the home they shared with Azariah, Ngo, and Chouap.

Second, Ross's involvement and admissions to the police provide additional circumstantial evidence to support the firearms enhancement. Ross's involvement in the conspiracy began as early as January 25, when he drove Azariah and Chouap to the robbery on McKinley Avenue. Ross, who admitted that he drove Azariah and Chouap to the January 25 and April 27 robberies, also admitted

39

that he was aware that Azariah and Chouap had firearms in the car and were armed with them when he drove them to the robberies. Further, Ross was still involved in the conspiracy at the time of his arrest because he was receiving money for selling the stolen merchandise, and there was no evidence that he ever abandoned the plan to aid in the robberies prior to January 25. The jury could infer from the facts that firearms were accessible and available to Ross, Azariah, and Chouap when Ross agreed to aid in the commission of the robberies by driving the car to and from the robberies, and then agreed to sell the stolen merchandise. Thus, we hold that there was sufficient evidence to support the firearms enhancement for Ross's conspiracy conviction.

Third, Oeung's involvement in the conspiracy, Remegio's testimony, and the circumstances leading up to the May 10 robbery support the firearms enhancement for Oeung's conspiracy conviction. On May 10, before the armed robbery of the Fernandez home, Oeung was riding in the car with Azariah and Chouap, sitting with at least one of them in the back seat as Ngo was driving when she agreed to knock on the Fernandezes' door. Azariah and Chouap were armed when they entered the Fernandez home a short time after Oeung knocked on the Fernandezes' door. It is a reasonable inference that Azariah and Chouap had the gun readily available in the car with Oeung when she agreed to aid the commission of the robbery and then knocked on the Fernandezes' door to establish that they were home. There was no evidence that Oeung abandoned the agreement prior to knocking on the Fernandezes' door and informing Azariah and Chouap that the couple was home.

The jury could also infer from the evidence that, as a passenger in the same car, Oeung knew that Azariah and Chouap were armed when they got out of the car and returned to the Fernandez

home. Thus, the jury could also infer from the evidence that the firearms were readily available and easily accessible to Oeung, or Azariah and Chouap, at the time Oeung agreed to aid in the commission of the Fernandez robbery, and then took a substantial step—driving to the Fernandez home and knocking on the door—to complete the robbery. Oeung's sufficiency challenge admits the truth of the State's evidence. Thus, we hold that there was sufficient evidence to support the firearms enhancement for Oeung's conspiracy conviction.

3. Ross's Firearm Enhancement—January 25, 2012 Robbery

Ross argues[17] that there was insufficient evidence to support the firearms enhancement for his convictions related to the January 25 robbery because there was no evidence that the firearm was actually operable. The State responds that the firearms enhancement is supported by the victim's testimony that she "knew" it was a gun and that the intruders "took pains" to ensure the victim "knew it was a real firearm." Br. of Resp't at 110. We hold that there is sufficient evidence to prove that the alleged firearm in the January 25 robbery was an operable firearm.

"'[I]n order to prove a firearm enhancement, the State must introduce facts upon which the jury could find beyond a reasonable doubt the weapon in question falls under the definition of a firearm.'" *Pierce*, 155 Wn. App at 714 (internal quotation marks omitted) (quoting *Recuenco*, 163 Wn.2d at 437). To uphold a firearm enhancement, the State must present the jury with sufficient evidence to find that the firearm was operable. *Pierce*, 155 Wn. App at 714. The State need not produce the actual firearm, but must produce some evidence that it was operable, such as "bullets found, gunshots heard, or muzzle flashes." *Pierce*, 155 Wn. App. at 714, fn. 11. In *Pierce*, an

---

[17] Ross also raises this issue in his SAG.

intruder woke the victims in the middle of the night and was holding what appeared to be a handgun, and covered the victims' heads while ransacking the home. This court held that absent other evidence that the alleged handgun was operable, that the witnesses' testimony that it "appeared" to be a handgun was insufficient to support a firearms enhancement. *Pierce*, 155 Wn. App. 714-715.

Here, Lem, the victim in the January 25, 2012, robbery, testified unequivocally that one of the intruders pointed a gun at her head. She testified that she did not actually see the gun because she was scared to look, but "knew" it was a gun, and the intruder asked, "Do you know what this is?" VI VRP at 800-01. But unlike in *Pierce*, where there was no other evidence regarding the alleged firearms, here, Ross admitted that he knew there were guns used in the January 25, 2012 robbery.

Thus, based on Lem's testimony that she knew it was a gun, the gunman asked her if she knew what the gun was, and Ross's testimony, the circumstantial evidence supports a reasonable inference that the firearm used in the January 25 robbery was operable and capable of firing a projectile. *Pierce*, 155 Wn. App. at 714, fn. 11. Viewing the evidence in the light most favorable to the State, we hold that there was sufficient evidence to support Ross's firearms enhancements for his convictions on counts I, II, III, V, and VI related to the January 25 robbery.

4. Oeung's Firearms Enhancements—Remaining Convictions

Oeung next argues that there is insufficient evidence to support the firearms enhancements for her eight remaining convictions because she did not know that Azariah and Chouap were armed with firearms at the time they entered the Fernandezes' home. We disagree.

Here, the same evidence analyzed above that supports the firearms enhancement for Oeung's conspiracy conviction also supports the firearms enhancement for her remaining eight convictions. Based on the evidence and testimony discussed above, the jury could infer that Oeung knew Azariah and Chouap were armed with firearms during the May 10 robbery. In addition, there was sufficient evidence from Fernandezes' testimony for a reasonable jury to infer that the firearm used in the May 10 robbery was operable. Thus, we hold that sufficient evidence supports the firearms enhancements for Oeung's remaining eight convictions related to the May 10 robbery.

D. CONSPIRACY

1. LEGAL PRINCIPLES

> A person is guilty of criminal conspiracy when, with intent that conduct constituting a crime be performed, he or she agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them takes a substantial step in pursuance of such agreement.

RCW 9A.28.040(1). "A conspiracy is a plan to carry out a criminal scheme together with a substantial step toward carrying out the plan." *State v. Williams*, 131 Wn. App. 488, 496, 128 P.3d 98 (2006). A formal agreement is not essential to the formation of a conspiracy, and can be shown by a "'concert of action, all the parties working together understandingly, with a single design for the accomplishment of a common purpose.'" *State v. Smith*, 65 Wn. App. 468, 471, 828 P.2d 654 (1992) (internal quotation marks omitted) (quoting *State v. Casarez-Gastelum*, 48 Wn. App. 112,

43

116, 738 P.2d 303 (1987)). "Proof of a conspiracy may be established by overt acts and 'much is left to the discretion of the trial court.'" *Smith*, 65 Wn. App. at 471-72 (internal quotation marks omitted) (quoting *Casarez-Gastelum*, 48 Wn. App. at 116).

But a conspiracy does not require that all of the criminal elements of the plan be proposed and agreed to at the same instant in time. *See Williams*, 131 Wn. App at 496 (stating that the defendant offers no legal authority to support his claim that he had to agree to all of the elements of the charged crime in order to be convicted of conspiracy). Circumstantial evidence may provide proof of a conspiracy. *State v. Barnes*, 85 Wn. App. 638, 664, 932 P.2d 669 (1997) (finding that defendant's acquaintance, business transactions, ownership of the home where the coconspirator lived, and unreported income was sufficient to prove that a conspiracy existed).

2. *CORPUS DELECTI*

Oeung argues that there is insufficient independent evidence, other than her statements to police, to support her conviction for conspiracy. We disagree.

The term "*corpus delecti*" means the "'body of the crime.'" *State v. Brockob*, 159 Wn.2d 311, 327, 150 P.3d 59 (2006) (internal quotation marks omitted) (quoting *State v. Aten*, 130 Wn.2d 640, 655, 927 P.2d 210 (1996). Under the *corpus delecti* rule, a defendant's self-incriminating statements cannot be the sole supporting evidence of the conviction. *State v. Dow*, 168 Wn.2d 243, 249, 227 P.3d 1278 (2010). The State must produce *independent* evidence other than the defendant's confession to provide prima facie corroboration that the crime described in the defendant's statement actually occurred, but this evidence need not be sufficient to support the conviction on a sufficiency of the evidence basis. *Brockob*, 159 Wn.2d at 328. "Prima facie

corroboration of a defendant's incriminating statement exists if the independent evidence supports a 'logical and reasonable inference' of the facts sought to be provided." *Brockob*, 159 Wn.2d at 328 (internal quotation marks omitted) (quoting *Aten*, 130 Wn.2d at 656). We review whether the State presented independent evidence under the *corpus delicti* rule in the light most favorable to the State. *Brockob*, 159 Wn.2d at 328.

Here, the trial court's instructions to the jury read, in pertinent part,

> To convict the defendant Soy Oeung of the crime of conspiracy to commit robbery in the first degree as charged in Count XIV, each of the following elements of the crime must be proved beyond a reasonable doubt: (1) That on or about the 10th day of May, 2012, defendant Oeung agreed with one or more persons to engage in or cause the performance of conduct constituting the crime of robbery in the first degree; (2) That the defendant made the agreement with the intent that such conduct be performed; (3) That any one of the persons involved in the agreement took a substantial step in pursuance of the agreement.

CP at 271 (Instruction no. 31). In her statement to police, Oeung admitted that, on May 10, Azariah, Ngo, and Chouap asked her to knock on the door of a house and ask for a specific person. After driving in Ngo's car to the house, Oeung admitted that she knocked on the front door and a man answered the door through a window next to the door, and she asked for the person as instructed. Remegio Fernandez testified that on May 10 a woman knocked on his door, but that he did not open it, instead he looked out of the front window to the side of the door, and the woman asked for "John." VII VRP at 949.

Oeung then told police that she returned to the car, a blue Dodge stratus, told the others that an old man was in the house, and then she drove around with Ngo, Azariah, and Chouap for 20-30 minutes. Remegio also testified that after he refused to open the door, the woman returned to a blue sedan, got in the passenger side, and it drove away.

45

Oeung stated that after they drove around, they parked the car about five–six blocks away from the home, and Azariah and Chouap got out and told Oeung and Ngo that "they were going to go check out a couple of houses." VRP (2/11/2012) at 96. Oeung stated that, "They said they were going to go get something or whatever." VRP (2/11/2012) at 96. Remegio testified that about an hour after the woman knocked on the door, two armed men entered his home while he and his wife were home. During the time that Azariah and Chouap were gone, Oeung stated that she and Ngo went to Jack-in-the-Box.

Oeung also stated that they were waiting "a long time" for Azariah and the other person to return, and that Ngo communicated with them via walkie-talkies, asking them, "What are you guys doing," and "When are you coming back?" VRP (2/11/2012) at 98. Remegio testified that the two intruders were communicating with a woman on a two-way radio who kept asking if the intruders were finished, and that before they left, the intruders told Remegio and Norma they had friends at the Jack-in-the-Box and "if [Remegio] did something" the friends would come over and "beat [them] up." VII VRP at 991. Norma also heard the intruders talking to a woman who asked if they were done searching. The men were in the Fernandez home for approximately three hours.

Finally, Oeung stated that Azariah and Chouap returned to the car with backpacks and that they gave her $200 for knocking on the door, which they pulled out of the backpacks, and that she saw a stack of $20 bills in a brown envelope. Remegio testified that the intruders took money they found in his daughter's room that she was saving for a trip, and that they took backpacks and suitcases to carry the stolen property.

Based on Oeung's relationship with Ngo, Azariah, and Chouap, her agreement to knock on the Fernandezes' door, her statement that she listened to Ngo talk to Azariah on a walkie-talkie during the robbery, and her admission that she and Ngo returned to a place nearby the Fernandez home to pick up Azariah and Chouap after waiting at Jack-in-the-Box, there is circumstantial evidence to support that Oeung knew that the others were going to commit a robbery and she conspired with them to help.

Further, Remegio's testimony mirrors Oeung's statement and timeline of events, and, based on that corroboration, is "sufficient to permit a logical and reasonable deduction that a conspiracy existed" and that Oeung was involved in the conspiracy. *Barnes*, 85 Wn. App. at 664-65. Thus, given Remegio's testimony and the circumstantial evidence regarding Oeung's relationship with her alleged co-conspirators, the State made an adequate prima facie corroboration of the crime described in Oeung's statement, and her statement was properly admitted and considered by the jury. *Brockob*, 159 Wn.2d at 328. Viewing the evidence in the light most favorable to the State, we hold that there was sufficient evidence to convict Oeung of conspiracy to commit first degree robbery as charged in count XIV.

E. OEUNG—ACCOMPLICE LIABILITY, FIRST DEGREE ROBBERY AND UNLAWFUL IMPRISONMENT

Oeung separately argues that there was insufficient evidence to convict her of two counts first degree robbery and unlawful imprisonment as an accomplice because she did not know of any crime beyond burglary. We disagree.

Criminal liability applies equally to a principal and an accomplice because they share equal responsibility for the substantive offense. *State v. Trout¸* 125 Wn. App. 403, 409, 105 P.3d 69

47

(2005). "'[W]hile an accomplice may be convicted of a higher degree of the general crime he sought to facilitate, he may not be convicted of a separate crime absent specific knowledge of the general crime.'" *Trout*, 125 Wn. App. at 410 (quoting *State v. King*, 113 Wn. App. 243, 288, 54 P.3d 1218 (2002)). However, an accomplice cannot be culpable beyond the crimes of which the accomplice has knowledge; for example, the jury cannot convict a defendant of robbery when the defendant intended merely to facilitate a theft. *Trout*, 125 Wn. App. at 410.

> Robbery is defined as
>
>> A person commits robbery when he or she unlawfully takes personal property from the person of another or in his or her presence against his or her will by the use or threatened use of immediate force, violence, or fear of injury to that person or his or her property or the person or property of anyone.

RCW 9A.56.190. The person must use or threaten force to obtain or retain possession of the property, or prevent or overcome any resistance to the taking. RCW 9A.56.190. The degree of force is immaterial. RCW 9A.56.190. A person is guilty of first degree robbery if during the commission of a robbery if "[he or she] is armed with a deadly weapon; or [d]isplays what appears to be a firearm or other deadly weapon." RCW 9A.56.200(1)(a)(i)-(ii). "A person is guilty of unlawful imprisonment if he or she knowingly restrains another person." RCW 9A.40.040(1).

Here, Oeung agreed to knock on the door to the Fernandezes' three-bedroom home to determine if anyone was home. After determining that the Fernandezes were home, returned to the car and told Ngo, Azariah, and Chouap that there was an "old man" in the home. VRP (2/11/2012) at 94. After driving around, they parked nearby the Fernandez home, and Azariah and Chouap got out to check out some houses, which Oeung knew to mean that they were "going to go take stuff." VRP (2/11/2012) at 96.

The evidence shows that Oeung knew the home was occupied when Azariah and Chouap got out of the car to "check out a couple of houses," and also shows that she knew they were going to "take stuff" from the homes. VRP (2/11/2012) at 96. The evidence also shows that Chouap and Azariah were armed when they entered the Fernandezes' home. It is a reasonable inference from the evidence and from Oeung's knowledge that the home was occupied, that Chouap and Azariah would likely use some amount of force or threat of force to procure property from the Fernandez home.

Oeung's challenge to the sufficiency of the evidence admits the truth of the State's evidence. *Salinas*, 119 Wn.2d at 201. Oeung knew and lived with Azariah and Chouap and knew that they were engaged in home invasion robberies. Further, she was in the car with Azariah and Chouap immediately before the robbery, knew they were entering an occupied home. The men were armed when they entered the Fernandezes' home, and because of her relationship with the men and their presence in the car immediately before the robbery, the jury could reasonably infer from evidence that Oeung knew that Chouap and Azariah were armed with a gun when they got out of the car to return to the Fernandezes' home.

Further, as discussed above, the jury could reasonably infer from the circumstantial evidence and Oeung's admission to police that Oeung knew that Azariah and Chouap were going to enter the home when she knocked on the door because they had asked her to do so, and that they would have to restrain the "old man" somehow in order to take stuff. While she did not see Norma Fernandez, it is a reasonable inference that, from the size of the home, another person may be present in the home.

49

Thus, viewing the evidence in the light most favorable to the State, there was sufficient evidence for the jury to reasonably infer from the circumstantial evidence that Oeung had knowledge that she aided Azariah and Chouap in committing a robbery, that Oeung knew Azariah and Chouap were armed because the home was occupied, and that there was a reasonable probability that Azariah and Chouap would have to restrain the home's occupants to complete their crime. Thus, we hold that there is sufficient evidence to uphold Oeung's convictions for two counts of first degree robbery and two counts of unlawful imprisonment.

## V. JURY INSTRUCTIONS ON FIREARM ENHANCEMENTS

Oeung and Ross argue that the trial court's jury instruction no. 59 on the firearms enhancements improperly lowered the State's burden of proof.[18] We disagree.

We review a trial court's jury instructions for abuse of discretion, but we review an alleged error of law in jury instructions de novo. *State v. Fleming*, 155 Wn. App. 489, 503, 228 P.3d 804 (2010). Jury instructions are sufficient when they are supported by the evidence, allow each party to argue its theory of the case, and inform the jury of the applicable law. *Fleming*, 155 Wn. App. at 503-04 (citing *State v. Clausing*, 147 Wn.2d 620, 626, 56 P.3d 550 (2002)). Failure to offer or request an instruction at trial precludes appellate review to challenge the absence of such instruction. *State v. Lucero*, 140 Wn. App. 782, 787, 167 P.3d 1188 (2007); *State v. Scott*, 110 Wn.2d 682, 691, 757 P.2d 492 (1988) (citing *State v. Kroll*, 87 Wn.2d 829, 843, 558 P.2d 173

---

[18] Oeung also argues that the instruction violated her constitutional right to due process and was an unconstitutional comment on the evidence. But Oeung does not provide any evidence in the record to support her contention that the trial court impermissibly commented on the evidence other than to suggest that the trial court failed to instruct the jury how to rule in her favor. This claim is without merit, and we do not address it.

(1976)).  Jury instructions, taken in their entirety, must inform the jury that the State bears the burden of proving every element of a criminal offense beyond a reasonable doubt.  *State v. Pirtle*, 127 Wn.2d 628, 656, 904 P.2d 245 (1995) (citing *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970)).

The jury must unanimously find beyond a reasonable doubt any aggravating circumstance that increases the penalty for the crime.  *State v. Nunez*, 174 Wn.2d 707, 712, 285 P.3d 21 (2012).  Unanimity is required to either answer "yes" or "no" on a special verdict form for an aggravating factor.  *See Nunez*, 174 Wn.2d at 716–17 (citing *State v Bashaw*, 169 Wn.2d 133, 234 P.3d 195 (2010) *overruled by Nunez*, 174 Wn.2d 207)) (to support argument that the jury can only answer "yes" or "no" if it is unanimously accepting or rejecting an aggravating factor).

In *Nunez*,[19] our Supreme Court held that the instruction in *Bashaw* was incorrect when it required the jury to answer "no" whenever each juror could not agree to answer "yes." *Nunez*, 174 Wn.2d at 719.  Oeung relies on the *Bashaw* instruction addressed in *Nunez* to support her argument.  The Supreme Court specifically rejected the *Bashaw* instruction in favor of the instruction used in *State v. Brett*, 126 Wn.2d 136, 173–74, 892 P.2d 29 (1995), which instructed the jury to leave the

---

[19] The jury instruction in *Nunez* stated,

> Because this is a criminal case, all twelve of you must agree in order to answer the special verdict forms.  In order to answer the special verdict forms "yes," you must unanimously be satisfied beyond a reasonable doubt that "yes" is the correct answer.  If you unanimously have a reasonable doubt as to this question, you must answer, "no."

*Nunez*, 174 Wn.2d at 710.

special verdict form blank if it could not reach a unanimous agreement to answer either "yes" or

"no" on the special verdict form. *Nunez*, 174 Wn.2d at 719.

>   Similar to the *Brett* instruction given in *Nunez*, corrected jury instruction no. 59 stated,

>   If you find the defendant not guilty of a particular count, do not use the corresponding special verdict form for that count. If you find the defendant guilty of a particular count, you will then use the special verdict form for that particular count. In order to answer a special verdict form "yes," all twelve of you must unanimously be satisfied beyond a reasonable doubt that "yes" is the correct answer. If you do not unanimously agree that the answer is "yes" then the presiding juror should sign the section of the special verdict form indicating that the answer has been intentionally left blank.

CP at 300. Neither Oeung nor Ross objected to this instruction nor proposed an alternative

instruction. The Supreme Court in *Nunez* ruled that the *Brett* instruction was "a more accurate

statement of the State's burden and better serves the purposes of jury unanimity." *Nunez*,

174 Wn.2d at 719. Similarly, the court's instruction no. 59 also requires that, in order to answer

"yes" on the special verdict form, the jury must find "that 'yes' is the correct answer" beyond a

reasonable doubt. Thus, we hold that the trial court's instruction no. 59 was proper.[20]

## VI. UNANIMITY INSTRUCTION

Oeung and Ross argue that their right to a unanimous jury verdict was violated when the

trial court did not give a *Petrich*[21] unanimity instruction. Oeung argues that we must reverse her

convictions for first degree burglary, first degree robbery, theft of a firearm, and the firearms

---

[20] Because we find that there was no error in the jury instructions, we do not address Oeung's contention that the error was manifest constitutional error.

[21] *State v. Petrich*, 101 Wn.2d 566, 683 P.2d 173 (1984), *overruled in part on other grounds by State v. Kitchen*, 110 Wn.2d 403, 756 P.2d 105 (1988).

enhancements because the State did not elect which firearm should form the basis for the charges and the firearms enhancements. Oeung also argues that we must reverse her conspiracy conviction because the State argued multiple acts could constitute the basis for the conspiracy.

Ross argues that we should reverse the firearms enhancements for his convictions for conspiracy, first degree burglary, first degree robbery, unlawful imprisonment, and first degree trafficking related to the April 27 robbery (counts VIII, IX, XI, and XIII) because the State did not elect which firearm formed the bases for these convictions.[22] Because the *Petrich* rule applies only to instances of multiple acts or alternative means of committing a crime, we hold that Oeung and Ross were not entitled to a *Petrich* instruction.

## A. LEGAL PRINCIPLES

Criminal defendants in Washington have a right to a unanimous jury verdict. *Emery*, 161 Wn. App. 172, 198, 253 P.3d 413 (2011); WASH. CONST. art. I, § 21. In some instances, the right to a unanimous jury verdict also includes the right to unanimity on the means by which the jury finds the defendant committed the crime. *Ortega-Martinez*, 124 Wn.2d 702, 707, 881 P.2d 231 (1994); *see also State v. Knutz*, 161 Wn. App. 395, 407-08, 253 P.3d 437 (2011) (stating that when the State presents evidence of multiple acts, unanimity is required for the particular criminal act).

---

[22] Neither Oeung nor Ross requested a unanimity instruction nor objected to the lack of *Petrich* instruction at trial. However, while RAP 2.5(a)(3) precludes them from raising the issue for the first time on appeal absent a showing of manifest constitutional error, we address their claims on appeal because the test for determining whether an alleged constitutional error is "manifest" is similar to the substantive issue of whether a *Petrich* instruction is required. *State v. Knutz*, 161 Wn. App. 395, 407, 253 P.3d 437 (2011).

In multiple acts cases, the State must inform the jury which act to rely on in its deliberations or the court must instruct the jury that they must all agree on a specific criminal act. *State v. Stockmeyer*, 83 Wn. App. 77, 86, 920 P.2d 1201 (1996). The threshold for determining whether unanimity is required on an underlying means of committing a crime is whether sufficient evidence exists to support each of the alternative means presented to the jury. *Ortega-Martinez*, 124 Wn.2d at 707. When the State presents evidence of multiple "distinct criminal acts" supporting a charge, the jury must be unanimous on the conduct supporting the conviction. *Petrich*, 101 Wn.2d 566, 572, 683 P.2d 173 (1984); *see also Kitchen*, 110 Wn.2d 403, 412, 756 P.2d 105 (1988) (stating that the State alleged several acts and any one could constitute the charged crime). However, no additional unanimity instruction is required if the evidence indicates a "'continuing course of conduct.'" *Knutz*, 161 Wn. App. at 408 (quoting *Handran*, 113 Wn.2d 11, 17, 775 P.2d 453 (1989)).

B. OEUNG'S CONSPIRACY CHARGE

The State charged Oeung with one count of conspiracy related to the ongoing nature of the conspiracy related to the May 10, 2012, robbery. Oeung argues that the State's closing arguments alleged multiple agreements, which "created a multiple acts scenario." Br. of Appellant Oeung at 43. We disagree.

"To determine whether criminal conduct constitutes one continuing act" or "several distinct acts," we determine whether Oeung's activity "shared a common purpose of promoting a criminal enterprise." *Knutz*, 161 Wn. App. at 408.

Here, there was evidence of only one agreement to support Oeung's single conspiracy charge, her agreement with Ngo, Azariah, and Chouap to aid them in robbing the Fernandezes'

home. Even though the State discussed different examples of agreements from which the jury could find or infer a criminal conspiracy, it did not argue that those examples were specific, distinct acts or that they involved more than one agreement or conspiracy by Oeung. Thus, because there was no evidence of "multiple distinct criminal acts," the State did not need to elect any one form of an agreement, nor did the trial court need to instruct the jury that it must agree on which underlying act supported Oeung's single conspiracy charge. Therefore, we hold that a *Petrich* instruction was not required for Oeung's conspiracy charge.

## C. FIREARM ENHANCEMENTS – OEUNG AND ROSS

Both Oeung and Ross argue that their right to a unanimous jury verdict was violated when the State failed to elect which firearm the jury should rely on to come to its decision, and when the trial court failed to provide a *Petrich* instruction.[23] We disagree.

The *Petrich* rule applies only to multiple acts or "alternative means" cases. *Stockmeyer*, 83 Wn. App. at 86. Therefore, while the State may have presented multiple firearms that could satisfy Oeung and Ross's firearm enhancements on their first degree burglary and first degree robbery charges, the jury only had to find beyond a reasonable doubt that Oeung's and Ross's accomplices were armed with *any firearm*, not a specific firearm.

Therefore, the State was not required to elect, nor was the trial court required to instruct the jury on which firearm it had to decide satisfied the firearms enhancement. *Stockmeyer*, 83 Wn.

---

[23] Oeung also argues that the "dispute" over which firearm the State needed to elect, "extended to the question whether the devices were firearms for purposes of the special allegations." We reject this assertion.

App. at 86.  If there was any doubt as to the firearm charges or the firearms enhancements, Oeung

and Ross could have requested a bill of particulars under CrR 2.1(c);[24] however, neither did so.

## VII. SENTENCING

### A.  SAME CRIMINAL CONDUCT

Oeung and Ross argue that the sentencing court erred when it failed to find that their

convictions for first degree burglary and robbery constituted the same criminal conduct under

RCW 9.94A.589(1)(a).[25]  We disagree, and hold that Oeung and Ross fail the three-part test to

justify viewing their crimes as the same criminal conduct.

### 1.  Legal Principles

We review a sentencing court's determination of same criminal conduct for abuse of

discretion or a misapplication of the law.  *State v. Graciano*, 176 Wn.2d 531, 536-37, 295 P.3d 219

(2013).

When the record supports only one conclusion on whether crimes constitute the same

criminal conduct, a sentencing court abuses its discretion in arriving at a contrary result; but where

the record adequately supports either conclusion, that matter lies in the court's discretion.  *State v.*

*Kloepper*, 179 Wn. App. 343, 357, 317 P.3d 1088 (2014).  Because a finding of the same criminal

---

[24] "The court may direct the filing of a bill of particulars.  A motion for a bill of particulars may be made before arraignment or within 10 days after arraignment or at such later time as the court may permit."  CrR 2.1(c).

[25] RCW 9.94A.589(1)(a) provides, in relevant part,

"Same criminal conduct," as used in this subsection, means two or more crimes that require the same criminal intent, are committed at the same time and place, and involve the same victim.

conduct favors the defendant, the defendant bears the burden of establishing that the crimes constitute the same criminal conduct. *Graciano*, 176 Wn.2d at 539.

"Two crimes manifest the 'same criminal conduct' only if they 'require the same criminal intent, are committed at the same time and place, and involve the same victim.'" *Graciano*, 176 Wn.2d at 540 (quoting RCW 9.94A.589(1)(a)). If one of the elements is missing, then the sentencing court must count the offenses separately in calculating the offender score. *State v. Knight*, 176 Wn. App. 936, 959, 309 P.3d 776 (2013). As part of the analysis, the court looks to whether one crime furthered another. *Graciano*, 174 Wn.2d at 540.

The burglary anti-merger statute provides,

> Every person who, in the commission of a burglary shall commit any other crime, may be punished therefore as well as for the burglary, and may be prosecuted for each crime separately.

RCW 9A.52.050. Under the burglary anti-merger statute, the trial court has the discretion to punish burglary as a separate offense, even if burglary and other crimes constitute same criminal conduct. *Knight*, 176 Wn. App. at 962. Our Supreme Court has held that burglary and robbery do not require the same objective criminal intent. *State v. Brett*, 126 Wn.2d 136, 170, 892 P.2d 29 (1995). Multiple crimes affecting multiple victims are not the same criminal conduct. *State v. Lessley*, 118 Wn.2d 773, 779, 827 P.2d 996 (1992) (rejecting the "central victim" concept).

2. Oeung's and Ross's Burglary and Robbery Convictions

Oeung and Ross argue that the sentencing court did not invoke the anti-merger statute when it ruled that their convictions for first degree burglary and first degree robbery were not the same

criminal conduct.[26]  But neither Oeung nor Ross offer legal support for their apparent contention

that the sentencing court must explicitly invoke the anti-merger statute for it to apply.[27]  Thus,

Oeung's and Ross's arguments fail.  Therefore, the sentencing court did not abuse its discretion

when it determined that Oeung's and Ross's convictions for first degree burglary and first degree

robbery were not the same criminal conduct.

3.  Same Criminal Conduct - Robbery and Unlawful Imprisonment

Oeung argues that her convictions for two counts of first degree robbery[28] and two counts

of unlawful imprisonment constitute the same criminal conduct.  We disagree.

The relevant elements of first degree robbery are as follows,

(1) A person is guilty of robbery in the first degree if:
(a) In the commission of a robbery or of immediate flight therefrom, he or she:
(i) Is armed with a deadly weapon; or
(ii) Displays what appears to be a firearm or other deadly weapon; or
(iii) Inflicts bodily injury.

RCW 9A.56.200(1)(a).

A person commits unlawful imprisonment "if he or she knowingly restrains another

person."  RCW 9A.40.040(1).  Unlawful imprisonment is, "a substantial interference . . . with the

liberty of another [which is a real or material interference with the liberty of the victim] as

---

[26] Ross argues this issue only for his convictions related to the January 25 robbery.

[27] The sentencing court did address RCW 9A.52.050, stating, "The case law and the statute do make it clear that burglary and robbery are separate offenses."  VRP (6/23/2014) at 43.

[28] Count XVI for first degree robbery and count XX for unlawful imprisonment pertain to Remegio Fernandez, and count XVII for first degree robbery and count XXI for unlawful imprisonment pertain to Norma Fernandez.

contrasted with a petty annoyance, a slight inconvenience, or an imaginary conflict." *State v. Washington*, 135 Wn. App. 42, 50, 143 P.3d 606 (2006) (internal quotation marks omitted).

In *State v. Louis*, our Supreme Court held that the defendant's robbery and kidnapping convictions were neither the same in law, nor the same in fact. 155 Wn.2d 563, 569-70, 120 P.3d 936 (2005).

> Louis's robbery and kidnapping charges were not the same factually: 'The robbery necessitated the intentional taking of jewelry at gunpoint, while the kidnapping charge was based on Louis's binding and gagging the victims with duct tape to facilitate commission of the robbery.'

*Louis*, 155 Wn.2d at 570 (quoting *State v. Louis*, 119 Wn. App. 1080, 2004 WL 79150 (2004)). While this case does not involve kidnapping, unlawful imprisonment is a lesser included offense of kidnapping, *State v. Davis*, 177 Wn. App. 454, 461, 311 P.3d 1278 (2013), and the same rationale should apply.

Here, Oeung argues that the unlawful imprisonment furthered the commission of the robbery and, we must consider whether the convictions constitute the same criminal conduct. But Oeung ignores the fact that there were two victims, and that Fernandez attempted to escape, but was apprehended.

This case is similar to the facts in *Louis*, where the defendant bound, gagged, and locked victims in a closet to facilitate his robbery of the jewelry store. *Louis*, 155 Wn.2d at 566-67. After Remegio attempted to escape, Oeung's accomplices bound his hands and legs, locking him and his wife in the bathroom. Remegio testified that Oeung's accomplices held him and Norma in the bathroom for more than an hour after his attempt at fleeing. Remegio's and Norma's restraint and confinement in the bathroom demonstrates a different criminal intent, an intent to materially restrain

the Fernandezes' liberty, than that of taking property of threat or force. Because the Fernandezes' restraint required a different criminal intent, Oeung fails to satisfy the "same criminal conduct" test stated in RCW 9.94A.589(1)(a). Thus, we hold that the sentencing court did not abuse its discretion when it determined that Oeung's convictions for two counts of first degree robbery and two counts of unlawful imprisonment were not the same criminal conduct.

B. DOUBLE JEOPARDY

Both Oeung and Ross argue that the sentencing court erred when, after it found that the second degree assault convictions[29] violated double jeopardy, it dismissed the charges without prejudice instead of with prejudice. Oeung argues separately that a duplicative jury verdict for her conspiracy conviction (Ross argues separately that the sentencing court erred when it dismissed without prejudice two of his other convictions, one for conspiracy (count VII) and one for unlawful imprisonment (count V).

The State concedes that the sentencing court violated double jeopardy when it dismissed Oeung's and Ross's second degree assault convictions and Ross's convictions for conspiracy in count VII and unlawful imprisonment in count V without prejudice, and that the proper remedy is for us to remand for the sentencing court to vacate and dismiss with prejudice these charges.

We agree that Oeung's convictions for second degree assault in counts XVIII and XIX and Ross's convictions for second-degree assault in counts IV and X, for conspiracy in count VII, and for unlawful imprisonment in count V violate double jeopardy. We remand to the sentencing court to vacate and dismiss these convictions with prejudice.

---

[29] Counts XVIII, XIX (Oeung); Counts IV, X (Ross).

C.  OEUNG—EXCEPTIONAL SENTENCE

Oeung argues that the sentencing court erred in denying her request for an exceptional downward sentence on the basis that mitigating factors existed.  We disagree.

Generally, there is no right to appeal a standard range sentence.  RCW 9.94A.585(1).  However, the statute does not preclude a procedural challenge to the manner in which the sentencing court imposed a standard range sentence.  *State v. Garcia-Martinez*, 88 Wn. App.at 329.  Thus, review is limited to circumstances where the sentencing court has refused to exercise discretion at all or has relied on an impermissible basis for refusing to impose an exceptional sentence below the standard range.  *Garcia-Martinez*, 88 Wn. App. at 330.

The sentencing court may impose a sentence above or below the standard range sentence if it finds, considering the purposes of the Sentencing Reform Act (SRA), that there are substantial and compelling reasons justifying the exceptional sentence.  RCW 9.94A.535.  The sentencing court may consider ten nonexclusive mitigating factors to impose an exceptional sentence below the standard range.  RCW 9.94A.535(1)(a-j).

Oeung argued that mitigating factors applied to her sentence under RCW 9.94A-.535(1)(d-g).[30] Oeung argued that she (1) lacked a predisposition to commit the crime and that she was "tempted by the lure of easy money" (RCW 9.94A.535(1)(d));[31] (2) "had fallen into the clutches of drug addiction" which affected her capacity to appreciate the "wrongfulness of her actions" (RCW 9.94A.535(1)(e));[32] had a "lesser degree of participation" than her accomplices (RCW 9.94A.535(1)(f)); and faces presumptive standard range sentences on her substantive crimes that, when coupled with the firearms enhancements, are excessive (RCW 9.94A.535(1)(g)). CP at 339-40.

To support her argument that the sentencing court abused its discretion to deny her an exceptional downward sentence, Oeung relies on the sentencing court's sympathetic statements

---

[30] RCW 9.94A.535(1)(d-g) provides,

> (d) The defendant, with no apparent predisposition to do so, was induced by others to participate in the crime.
>
> (e) The defendant's capacity to appreciate the wrongfulness of his or her conduct, or to conform his or her conduct to the requirements of the law, was significantly impaired. Voluntary use of drugs or alcohol is excluded.
>
> (f) The offense was principally accomplished by another person and the defendant manifested extreme caution or sincere concern for the safety or well-being of the victim.
>
> (g) The operation of the multiple offense policy of RCW 9.94A.589 results in a presumptive sentence that is clearly excessive in light of the purpose of this chapter, as expressed in RCW 9.94A.010.

[31] Oeung's argument relied largely on her "personal and cultural background," as discussed in the Mitigation Report as a mitigating factor. CP at 339.

[32] Oeung's drug use is exempted from the mitigation factors. RCW 9.94A.535(1)(e).

regarding her background. However, there is no evidence that the sentencing court's decision was legally incorrect or that it refused to exercise its discretion.

The sentencing court, while sympathetic to Oeung's factual background, stated that her "terrible background[]" did not support an exceptional sentence. VRP (6/23/2014) at 65. The sentencing court also found that, while her participation was less than that of her accomplices, Oeung's participation in the May 10 robbery was not minimal. Finally, while it stated its concern with the amount of time mandated by the firearms enhancements, the sentencing court also acknowledged that the legislature has chosen to impose a harsh punishment for the use of firearms in a crime and that "when you introduce a firearm to these kind of cases, you ratchet up the potential for disaster exponentially higher." VRP (6/23/2014) at 66.

Based on these considerations, we hold that the sentencing court did not abuse its discretion when it did not give Oeung an exceptional sentence below the standard range. Thus, we affirm.

D. DUPLICATE VERDICT

Oeung also argues that the sentencing court erred and violated double jeopardy when it did not vacate the jury's duplicate verdict on Count XIV for conspiracy. The jury filled in two identical verdict forms for count XIV with "guilty." CP at 305-06. However, Oeung was only charged for one count of conspiracy, and was sentenced for only the single count. Oeung does not demonstrate that this error was prejudicial, and the duplicate verdict form appears to be a harmless clerical error.

E.  INEFFECTIVE ASSISTANCE OF COUNSEL

Ross argues that his counsel was ineffective because he did not argue that the charges for first-degree robbery and unlawful imprisonment related to the April 27 robbery constituted the same criminal conduct.  We disagree.

To prevail on a claim of ineffective assistance of counsel, the defendant must show that (1) counsel's performance was deficient and (2) that the deficient performance resulted in prejudice to the defendant.  *State v. Humphries*, 181 Wn.2d 708, 719-20, 336 P.3d 1121 (2014) (citing *Strickland v. Washington*, 466 U.S. 668, 687-88, 694, 104 S. Ct. 2052, 80 L. Ed. 2d. 674 (1984)).  Performance is deficient if it falls "'below an objective standard of reasonableness.'" *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011) (quoting *Strickland*, 466 U.S. at 688).  Defendant bears the burden of establishing deficient performance and must overcome "'a strong presumption that counsel's performance was reasonable.'" *Grier*, 171 Wn.2d at 33 (citing *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009)).  A failure to demonstrate either deficient performance or prejudice defeats an ineffective assistance claim.  *Emery*, 161 Wn. App. at 188.  Legitimate trial tactics and strategies generally do not constitute deficient performance.  *Kyllo*, 166 Wn.2d at 863.  For the prejudice prong of the *Strickland* test, the defendant must prove that "'there is a reasonable probability that, but for counsel's deficient performance, the outcome of the proceedings would have been different.'" *Grier*, 171 Wn.2d at 34 (quoting *Kyllo*, 166 Wn.2d at 862).

Here, the record indicates that counsel did argue that the first degree robbery and unlawful imprisonment charges relating to the April 27 incident should merge and be vacated.  Thus, because

there is no evidence that counsel's performance was deficient, we hold that Ross's claim of ineffective assistance of counsel fails.

## VIII. STATEMENT OF ADDITIONAL GROUNDS (SAG)

Ross raises two additional claims in his SAG that we did not address and resolve above.

### A. SUGGESTIVE PHOTOMONTAGE/GOVERNMENTAL MISCONDUCT

Ross claims that the photomontage identification procedure shown to Kuch was impermissibly suggestive and violated Ross's due process right to a fair trial. Ross claims that the detective who showed Kuch the first photomontage improperly commented that the person she identified was not involved in the robbery. Ross claims that this improper comment tainted Kuch's subsequent identification of Choaup as one of the robbers and also her in court identification of Choaup. Ross claims that the detective's improper comment constitutes government misconduct and was prejudicial, and that dismissal of counts VIII, IX, XI, XII and XIII is warranted under CrR 8.3(b). We disagree.

Ross did not object at trial or argue that the procedure was impermissibly suggestive. He raised the issue for the first time on appeal in his SAG. Under RAP 2.5(a)(3), an appellate court may refuse to hear any claim of error which was not raised at the trial court, unless the error is a "manifest error affecting a constitutional right." If an appellate court determines that the claim raises a constitutional error, it must then determine whether the error was "manifest," or caused actual prejudice. *State v. O'Hara*, 167 Wn.2d 91, 98, 217 P.3d 756 (2010). To establish actual prejudice, a defendant must show that the asserted error had practical and identifiable consequences at trial. *O'Hara*, 167 Wn.2d at 99.

Ross's claim of an impermissible suggestive identification raises a due process constitutional issue. However, Ross must show that the error in the photomontage identification procedure was "manifest," by showing that it actually prejudiced him at trial. RAP 2.5(a). He fails to do so.

An out of court identification meets due process if it is not so impermissible as to create a substantial likelihood of misidentification. *State v. Brown*, 128 Wn. App. 307, 312, 116 P.3d 400 (2005). Generally, "courts have found lineups or montages to be impermissibly suggestive solely when the defendant is the only possible choice given the witness's earlier description." *State v. Ramires*, 109 Wn. App. 749, 761, 37 P.3d 343 (2002). A defendant making a claim of an impermissible identification procedure must first show that the procedure was impermissibly suggestive. If the defendant fails to meet this initial burden, the inquiry ends. *Brown*, 128 Wn. App. at 312-13. If the defendant meets this burden, then the court determines whether the identification procedure contains sufficient indicia of reliability despite the suggestiveness. *Brown*, 128 Wn. App. at 312-13.

Ross claims that Kuch identified Choaup as one of two robbers involved in the Kuch robbery based on photomontage number 3. Ross claims that Kuch's identification of Choaup was done at the direction of the detective, and that this identification was based on her review of a prior identification from another photomontage which was not admitted at trial.

Kuch testified that when she first met with the detective and pointed out a person from the photomontage, the detective told her that person was not involved in the robbery. She then testified that when she met the detective the second time, that she was shown another photomontage, and

that she initialed next to photograph "number 3" because the detective told her to do so based on her prior identification. V VRP 673-74. Upon further examination, Kuch clarified that, when she was asked why she identified Choaup as one of the robbers on photomontage number 3, she testified that he "looked similar to the person who tied her up" and who threatened her. V VRP at 674-75. This second photomontage identifying Choaup was admitted into evidence as exhibit 5. There is no evidence that the first photomontage she was shown was admitted, or that Choaup was included in the first photomontage that Kuch reviewed.

Ross cannot show that the photomontage identification procedure was impermissibly suggestive. Contrary to Ross's claim, Kuch identified Choaup as the robber, not as a result of the detective's direction (as a result of the first photomontage), but because Choaup looked similar to the person who tied her up and who threatened her. Kuch's testimony at trial was consistent that Choaup was one of the robbers. Thus, there was not a substantial likelihood of misidentification as a result of the identification procedure used.

Ross also fails to show that the identification procedure actually prejudiced him. Ross admitted that Choaup was one of the robbers at Kuch's home, that he drove Choaup and Azias to Kuch's home, that he waited for them in the car, that they returned to the car with a pillow case, cash, and jewelry, that he drove them home, and that he took photographs of the jewelry in order to sell it for Choaup and Azias. For these reasons, Ross fails to show that the identification procedure actually prejudiced him.

Ross claims that the identification procedure constitutes government misconduct and prejudiced him and thus dismissal of counts VIII, IX, XI, XII, and XIII is warranted under CrR

67

8.3(b). To support dismissal of charges under CrR 8.3(b), the defendant must show both (1) arbitrary government action or misconduct, and (2) actual prejudice to the defendant's right to a fair trial. *State v. Martinez*, 121 Wn. App. 21, 29-30, 86 P.3d 2010 (2004). Ross cannot show arbitrary government action or misconduct in the photomontage identification procedure, and he cannot show actual prejudice as analyzed above. Thus, dismissal of those charges under CrR 8.3(b) is not appropriate and Ross's SAG claim fails.

## B. ROSS'S SENTENCE FOR CONSPIRACY AND UNLAWFUL IMPRISONMENT

Ross next claims that the sentence imposed for his conspiracy and unlawful imprisonment convictions (counts I and XI) exceed the statutory maximum when counted with the firearms enhancements and that the court should remand for resentencing. Oeung submitted supplemental briefing on May 19, 2016, arguing that the sentencing court also erred when it calculated the sentencing range for count XIV. We agree, and remand to the sentencing court with instructions to correct the sentencing ranges for Ross on counts I and XI and for Oeung on count XIV.

An unpreserved sentencing error may be raised for the first time on appeal. *State v. Jones*, 182 Wn.2d 1, 6, 338 P.3d 278 (2014). The legislature has plenary authority over sentencing. *Jones*, 182 Wn.2d at 6 (citing *State v. Benn*, 120 Wn.2d 631, 670, 845 P.23d 289 (1993)). RCW 9.94A.506(3) provides,

> The standard sentence ranges of total and partial confinement . . . are subject to the following limitation[]:
> . . . .
> (3) The maximum term of confinement in a range may not exceed the statutory maximum for the crime as provided in RCW 9A.20.021.

When calculating the standard sentence range with a firearm enhancement,

> If the standard sentence range under this section exceeds the statutory maximum sentence for the offense, the statutory maximum sentence shall be the presumptive sentence unless the offender is a persistent offender. If the addition of a firearm enhancement increases the sentence so that it would exceed the statutory maximum for the offense, the portion of the sentence representing the enhancement may not be reduced.

RCW 9.94A.533(3)(g). Thus, when calculating an offender's standard sentence range, including firearms enhancements, the sentencing court must reduce the base sentence range and may not reduce the firearms enhancement to comply with RCW 9.94A.021 and .533(3)(g).

Here, the statutory maximum for Ross's count I was 10 years, and for count XI it was 5 years. For count I, the sentencing court calculated a total standard range, including his firearms enhancements, of 132.75 to 164.25 months (approximately 11 years, 1 month to 13 years, 8 months). For count XI, the sentencing court calculated a total standard range, including firearms enhancements, of 61 to 75 months (5 years, 1 month to 6 years, 3 months).

For Oeung, the statutory maximum for count XIV was 10 years. The sentencing court calculated a standard total range, including her firearms enhancements, of 132.75 to 164.25 months. Thus, the total standard ranges for Ross's convictions on counts I and XI and Oeung's conviction for count XIV exceed the statutory maximum term allowed for the convictions. Therefore, we remand to the sentencing court with instructions to resentence Ross on counts I and XI and Oeung on count XIV not to exceed the statutory maximum under RCW 9.94A.021 and .533(3)(g).[33]

---

[33] We also note the scrivener's error on page 2 of Ross's judgment and sentence. The judgment and sentence cites count LXXII, however, it should read LXXI, as count LXXII does not exist in the State's amended information. Therefore, we reverse Ross's judgment and sentence pertaining to count LXXII, and remand to the trial court to correct this error and resentence Ross for count LXXI.

No. 46425-0-II
(Cons. with No. 46435-7-II)

CONCLUSION

We affirm in part, reversed in part, and remand in part for resentencing. We reverse Oeung's and Ross's convictions dismissed without prejudice on double jeopardy grounds and remand with instructions that the sentencing court vacate and dismiss those convictions[34] with prejudice. We also remand with instructions to resentence Ross on counts I and XI and Oeung on count XIV not to exceed the statutory maximum sentence, acknowledge the scrivener's error regarding Ross's count LXXII, and order the sentencing court to resentence Ross on count LXXI.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

SUTTON, J.

We concur:

MAXA, A.C.J.

MELNICK, J.

---

[34] Counts XVIII and XIX for Oeung; Counts IV, V, VII, and X for Ross.